FILED

ORDERED PUBLISHED

MAR 11 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-12-1633-En Banc |
| BENJAMIN MOONKANG HUH, | Bk. No. 2:10-bk-53971-BR |
| Debtor. | Adv. No. 2:11-ap-01143-BR |
| ANIL SACHAN, | |
| Appellant, | |
| v. | **O P I N I O N** |
| BENJAMIN MOONKANG HUH, | |
| Appellee. | |

Argued and Submitted En Banc on November 21, 2013
at Pasadena, California

Filed - March 11, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Barry Russell, Bankruptcy Judge, Presiding

Appearances: Allen B. Felahy of Felahy Law Group argued for Appellant Anil Sachan; J. Scott Bovitz of Bovitz & Spitzer argued for Appellee Benjamin Moonkang Huh.

Before: DUNN, Chief Judge, PAPPAS, KIRSCHER, TAYLOR, and KURTZ, Bankruptcy Judges.

DUNN, Chief Judge:

**INTRODUCTION**

Appellant Anil Sachan ("Sachan") appeals the bankruptcy court's judgment in an adversary proceeding ("Adversary Proceeding") in favor of appellee and defendant/debtor Benjamin Huh ("Huh") on Sachan's exception to discharge claim under § 523(a)(2)(A) of the Bankruptcy Code.[1] In light of the Supreme Court's recent decision in Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013), we voted to hear this appeal en banc to reconsider the Panel's prior published opinions on the question of when, if ever, it is appropriate to impute vicarious liability in an exception to discharge action based on fraud. See Ninth Circuit BAP Rule 8012-2(a), (c) and (d). We AFFIRM.

**I. FACTUAL BACKGROUND**[2]

Huh is a licensed real estate broker. From some time in 2001 until August 2004, Huh operated a real estate and business brokerage business as a sole proprietorship under the dba "America Realty & Investment," which he had registered with the State of California Department of Real Estate. In August 2004, Huh incorporated his business as Amerity, Inc., but he did not

---

[1] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] The facts are essentially undisputed by the parties. We rely in large part on the bankruptcy court's Findings of Fact and Conclusions of Law entered on November 26, 2012 ("Findings and Conclusions"), as supplemented by other parts of the record, for the factual narrative included herein.

-2-

cancel his personal registration of the America Realty & Investment dba and transfer it to Amerity, Inc. At all relevant times, Huh personally held the California real estate broker's license for his business.

At some point in time, not clear from the record but encompassing the period 2004 through early 2005, Mr. Jay Kim ("Kim") was associated with Amerity, Inc. and Huh as a part-time sales agent. Kim engaged in real estate sales activities as an agent in reliance on Huh's real estate broker's license. While they were affiliated, the record reflects that Huh generally supervised and provided some training to Kim.

In August 2004, Sachan, a resident of England, was looking for a business to purchase in Southern California. His background was as an avionics engineer. Sachan obtained information about "La Mexicana Market" in Long Beach, California (the "Market") over the internet, targeted the Market as a potential acquisition and traveled to Southern California to investigate the Market.

In September 2004, Sachan met with Kim at the America Realty & Investment office to discuss his potential acquisition of the Market. As Sachan remembered the meeting, Kim explained to him that the Market "could be managed from another country with minimal involvement and expense on my part." Kim further represented that the Market "generated $35,000 in monthly profits" and "had a monthly gross of $340,000."

At a meeting several days later, again at the offices of America Realty & Investment, Kim gave Sachan a "Disclosure Regarding Real Estate Agency Relationships" form ("Disclosure

-3-

Form"), advising sellers and buyers, among other things, that the sales agent might represent both sides in a transaction. The only agent identified on the Disclosure Form is America Realty & Investment, with Huh named as contact.[3] At the same meeting, Sachan signed a purchase contract for the Market that identified America Realty & Investment as the Selling Agent and Broker.

The Market purchase closed on or about March 2, 2005, with a total purchase price of $1,021,877.48 for the Market and its inventory. Kim received a commission on the purchase of $38,750, and Amerity, Inc. received $1,080.

Within weeks following the closing, Sachan received notice from the City of Long Beach Department of Planning and Building ("Planning Department") that his request for an operating license for the Market would be denied unless various code violations were corrected and approved plans and permits were provided for various structures. Due to the costs of complying over a relatively short timetable, Sachan was unable to satisfy the Planning Department's requirements and ultimately was denied a business license. In addition, the Market was cited for five fire code violations and forty-seven health code violations.

Sachan further discovered that the Market was generating sales at a far lower rate than had been represented to him, closer to $250,000 a month than the represented $340,000-$350,000. After suffering heavy losses, Sachan resold the Market for $660,000. A lawsuit in the Los Angeles Superior Court

---

[3] The Disclosure Form reflects that it was signed by Sachan on September 22, 2004.

-4-

("State Action") followed.

In the State Action, Sachan alleged a number of claims, including fraud, against multiple defendants, including the former owner of the Market, Kim and America Realty & Investment. On October 22, 2007, the jury in the State Action rendered a special verdict[4] in favor of Sachan. The Los Angeles Superior Court ("State Court") entered a Judgment on Special Verdict in the State Action including the following questions and answers:

> "Did Jay Kim and/or America Realty & Investment make an untrue representation of an important fact to Anil Sachan and/or Orion Sachan Corporation [Sachan's wholly-owned corporation]? (Yes.)"
>
> "Did Jay Kim and/or America Realty & Investment know that the representation was false, or did he/it make the representation recklessly and without regard for its truth? (Yes.)"
>
> "Did Jay Kim and/or America Reality & Investment intend that Anil Sachan and/or Orion Sachan Corporation rely on the representation? (Yes.)"
>
> "Did Anil Sachan and/or Orion Sachan Corporation reasonably rely on the representation? (Yes.)"
>
> "Was Anil Sachan and/or Orion Sachan Corporation's reliance on Jay Kim and/or America Realty & Investment's representation a substantial factor in causing harm to Anil Sachan and/or Orion Sachan Corporation? (Yes.)"
>
> "[P]lease state Anil Sachan and/or Orion Sachan Corporation's economic loss: $678,000.00."
>
> "[P]lease state Anil Sachan's non-economic loss, including physical pain/mental suffering: $39,500.00."

Judgment on Special Verdict at 2-10.

In the meantime, on November 16, 2007, Huh quietly cancelled

_____

[4] See Cal. Civ. Proc. Code § 624 (distinguishing between general and special verdicts).

-5-

his registration of the America Realty & Investment dba with the California Department of Real Estate.

In 2010, Sachan moved the State Court to add Huh as a defendant in the State Action. Following an evidentiary hearing, the State Court granted the motion based on its findings that Huh, as the holder of the real estate broker's license for his business, was the only person who legally could engage in the subject transaction, and that Huh's exculpatory evidence and arguments were inadequate and not credible.

On August 16, 2010, the State Court entered an Amended Judgment on Special Verdict in the State Court Action ("Amended Judgment"), determining and ordering that Huh was jointly and severally liable to pay a judgment to Sachan in the amount of $913,867.96, with interest at 10% from October 30, 2007. We confirmed at oral argument that the Amended Judgment was not appealed; so, for purposes of this appeal, the Amended Judgment is final under California law.

On October 13, 2010, Huh filed for bankruptcy relief under chapter 7. On January 18, 2011, Sachan filed a timely complaint initiating the Adversary Proceeding to except the Amended Judgment debt from Huh's discharge under § 523(a)(2)(A).

In denying a motion for summary judgment, the bankruptcy court concluded that issue preclusion did not support a determination that Huh committed fraud for purposes of § 523(a)(2)(A). That conclusion is not challenged in this appeal. Thereafter, the bankruptcy court conducted a trial in the Adversary Proceeding, at which direct testimony of Sachan and Huh was submitted by declaration, but both Sachan and Huh further

appeared and testified live. At the conclusion of the proceedings on April 3, 2012, the bankruptcy court stated that it was going to rule for Sachan based on its understanding that it was bound by the decision in <u>Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)</u>, 287 B.R. 515 (9th Cir. BAP 2002), hereinafter referred to as "<u>Tsurukawa II</u>." The bankruptcy court further made the following fact findings orally:

> I think that the facts were that we have Huh, who was running the operation through his dba America Realty and Investment, and clearly Kim was his agent under any definition, real estate agent, but aside from that, just agency relationship. He [Huh] was the only person who had the license who could do this. So, it was clearly that was the relationship.

April 3, 2012 Hr'g Tr. at 182:18-24.

After post-trial briefing, in further proceedings, the bankruptcy court noted that it was incorrect in its assumption at the trial that it was bound by this Panel's decision in <u>Tsurukawa II</u> as a decision of the Ninth Circuit and advised counsel that it would consider carefully their post-trial briefs and would investigate relevant authorities further before coming to a final decision.

At a further hearing on October 2, 2012, the bankruptcy court announced its conclusion that imputed liability of a principal for the active fraud of an agent would not support an exception to discharge under § 523(a)(2)(A). Although it reiterated its finding that Kim was Huh's agent, the bankruptcy court declined to impute Kim's fraud to Huh. Accordingly, the bankruptcy court found in favor of Huh on Sachan's claim and directed counsel for Huh to prepare findings of fact and conclusions of law and a judgment in favor of Huh consistent with

its rulings.

In the Findings and Conclusions, the bankruptcy court found the following facts, among others:

20. Benjamin Huh never communicated directly or indirectly with Anil Sachan or any representative of Orion Sachan Corporation regarding the purchase of [the Market].

21. Huh made no misrepresentations to Anil Sachan or any representative of Orion Sachan Corporation regarding the purchase of [the Market].

22. Neither Jay Kim, nor anyone else, made any misrepresentations to Sachan on Huh's behalf regarding the sale of [the Market].

23. Prior to the sale of [the Market] on March 2, 2005, Benjamin Huh was not aware of [the Market] (and so Huh knew of no defects therein).

24. Prior to the sale of [the Market] on March 2, 2005, Benjamin Huh was not aware of [the Market] (and so Huh did not know if [the Market] was generating profits or not).

25. Huh was not aware of the Sachan/Orion Sachan Corporation purchase of [the Market] until after the sale closed on March 2, 2005.

Findings and Conclusions at 8-9.

A dismissal judgment was entered in favor of Huh in the Adversary Proceeding on November 26, 2012. Sachan filed a timely Notice of Appeal.

## II.   JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## III.   ISSUE

Did the bankruptcy court err in declining to impute the fraud of Huh's agent, Kim, to Huh for purposes of excepting Huh's debt to Sachan from discharge under § 523(a)(2)(A)?

-8-

## IV.    STANDARDS OF REVIEW

We review a bankruptcy court's legal conclusions, including its interpretation of provisions of the Bankruptcy Code, de novo. Roberts v. Erhard (In re Roberts), 331 B.R. 876, 880 (9th Cir. BAP 2005), aff'd, 241 Fed. Appx. 420 (9th Cir. 2007).  De novo review requires that we consider a matter anew, as if no decision had been rendered previously.  United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988); B-Real, LLC v. Chaussee (In re Chaussee), 399 B.R. 225, 229 (9th Cir. BAP 2008).

We may affirm on any basis supported by the record.  Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

## V.    DISCUSSION

Section 523(a)(2)(A) excepts from a debtor's discharge debts resulting from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  A creditor seeking to except a debt from discharge based on fraud bears the burden of proof by a preponderance of the evidence to establish each of five elements:  (1) misrepresentation, fraudulent omission or deceptive conduct; (2) knowledge of the falsity or deceptiveness of such representation(s) or omission(s); (3) an intent to deceive; (4) justifiable reliance by the creditor on the subject representation(s) or conduct; and (5) damage to the creditor proximately caused by its reliance on such representation(s) or conduct.  Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009).

It is axiomatic that one of the major policy objectives of

-9-

the Bankruptcy Code is to provide the "honest but unfortunate" debtor with a fresh start. Bugna v. McArthur (In re Bugna), 33 F.3d 1054, 1059 (9th Cir. 1994), citing Grogan v. Garner, 498 U.S. 279, 286-87 (1991). Consequently, the exception to discharge provisions of the Bankruptcy Code are interpreted strictly in favor of debtors. In re Bugna, 33 F.3d at 1059.

A. Imputed Fraud and § 523(a)(2)(A)

1. The Impact of Two Early Supreme Court Decisions

Interpretation of § 523(a)(2)(A) has been impacted by two late nineteenth century Supreme Court opinions interpreting a predecessor provision of the Bankruptcy Act of 1867 (the "1867 Act"). The subject statute provided that "no debt created by the fraud or embezzlement of the bankrupt, or by defalcation as a public officer, or while acting in a fiduciary capacity, shall be discharged under this act." 1867 Act, Ch. 176, § 33, 14 Stat. 517, 533 (1867) (repealed 1878).

In Neal v. Clark, 95 U.S. 704 (1877), the debtor had purchased assets from the executor of an estate. It later was determined that the executor had sold the assets in violation of his fiduciary duties. In spite of the debtor's discharge in bankruptcy, the Virginia state courts held that the debtor still was liable vicariously for the executor's breach of fiduciary duty. Id. at 704-05.

The Supreme Court reversed in a unanimous decision authored by Justice John Marshall Harlan. In its decision, the Supreme Court interpreted the term "fraud" to mean positive or active fraud, and not "implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." Id. at 709.

-10-

Eight years later, the same provision of the 1867 Act was before the Supreme Court again for interpretation under different factual circumstances in Strang v. Bradner, 114 U.S. 555 (1885). In Strang, the question was whether the debts of all partners, based on one partner's fraud, were excepted from their discharge in bankruptcy. The record reflected that the other partners did not actively participate in their partner's fraud, but the proceeds from his fraud went into the partnership business. Id. at 558.

The decision of the Supreme Court again was unanimous and again was authored by Justice Harlan. While noting the continuing validity of its decision in Neal, the court ultimately concluded that the debts of the innocent partners were not dischargeable, based on the following analysis:

> [W]e are of [the] opinion that [a partner's] fraud is to be imputed . . . to all the members of his firm. The transaction between him and the plaintiffs is to be deemed a partnership transaction, because, in addition to his representation that the notes were for the benefit of his firm, he had, by virtue of his agency for the partnership, and as between the firm and those dealing with it in good faith, authority to negotiate for promissory notes and other securities for its use. Each partner was the agent and representative of the firm with reference to all business within the scope of the partnership. And if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge. This is especially so when, as in the case before us, the partners, who were not themselves guilty of wrong, received and appropriated the fruits of the fraudulent conduct of their associate in business.

Id. at 561.

-11-

The apparent contradictions between the Neal and Strang decisions are best explained in light of the late nineteenth century view as to what relief a debtor was entitled to in bankruptcy.

Unlike the current Bankruptcy Code, the provisions of the 1867 Act were not liberally construed in favor of debtors. Obtaining a discharge in bankruptcy proved exceedingly difficult; less than one-third of debtors obtained one. See Charles Jordan Tabb, The Historical Evolution of the Bankruptcy Discharge, 65 AM. BANKR. L.J. 325, 357 (1991). This was due, in part, to the lengthy list of exceptions to discharge contained in the 1867 Act. Id. at 358 (citing 1867 Act § 29). The 1867 Act included "[v]irtually every ground for denying discharge included in any of the previous English or American bankruptcy laws . . . along with several new additions." Id. at 358-59.

The exceptions to discharge were, in fact, considerably broader than under the subsequent Bankruptcy Act of 1898 (the "1898 Act"). See Crawford v. Burke, 195 U.S. 176, 189 (1904) (noting that under § 33 of the 1867 Act, any debt created by the debtor while acting in a fiduciary capacity was excepted from discharge). In contrast, under the 1898 Act, the category of debts excepted from discharge was narrowed to debts for "frauds, or obtaining property by false pretenses or false representations, or for willful and malicious injuries to the person or property of another," and debts "created by [the debtor's] fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." 1898 Act, 30 Stat. 544 § 17 (1898) (repealed 1978).

-12-

Against this background, the Strang court imputed fraud (and, thus, liability for exception to discharge purposes) based on general theories of partnership and agency. As was characteristic at the time, these theories were based on the common law rather than on any specific state statutes. Closer inspection reveals that most, if not all, of the case authorities relied on by the Strang court involved matters where the application of agency principles involved partnership law, as well as reliance on three leading treatises on partnership law. Strang, 114 U.S. at 561-62. Agency law, as we understand it today, was not well developed.

While the current Bankruptcy Code is derived in part from the 1898 Act and its predecessors (including the 1867 Act), the Bankruptcy Code embodies a shift in the fundamental policies and purposes of bankruptcy law. Among other changes, the concept of the discharge under the Bankruptcy Code is much more expansive. Clearly, Congress did not legislatively address Strang directly when it enacted the Bankruptcy Code. But, it appears that the Bankruptcy Code undercut some of the assumptions upon which the 1867 Act and, by extension, Strang rested.

Nevertheless, neither Neal nor Strang subsequently has been overruled, and they constitute part of the background to the adoption of § 523(a)(2)(A) by Congress in the Bankruptcy Code and its subsequent amendments. See, e.g., United States v. Alvarez-Hernandez, 478 F.3d 1060, 1065 (9th Cir. 2007):

Under the rules of statutory construction, we presume that Congress acts "with awareness of relevant judicial decisions." United States v. Male Juvenile, 280 F.3d 1008, 1016 (9th Cir. 2002); accord United States v. Hunter, 101 F.3d 82, 85 (9th Cir. 1996) ("[A]s a matter

-13-

of statutory construction, we 'presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'") (quoting <u>Goodyear Atomic Corp. v. Miller</u>, 486 U.S. 174, 184-85 . . . (1988)). We also "presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation," <u>Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.</u>, 307 F.3d 1064, 1072 (9th Cir. 2002)[.]

2. <u>Subsequent Circuit Court Decisions Outside the Ninth Circuit</u>

In attempting to reconcile <u>Neal</u> and <u>Strang</u> in § 523(a)(2)(A) cases dealing with imputed fraud, at least three lines of authority have developed among the circuit courts of appeals: a) decisions generally denying discharge in all such cases; b) decisions denying discharge only if the debtor benefitted from the subject fraud; and c) decisions denying discharge only if the subject debtor knew or should have known of the fraud. <u>See</u> Theresa J. Pulley Radwan, <u>Determining Congressional Intent Regarding Dischargeability of Imputed Fraud Debts in Bankruptcy</u>, 54 MERCER L. REV. 987, 1008 (Spring 2003).

Exemplary of the most "absolute" approach is the decision of the Fifth Circuit in <u>Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)</u>, 239 F.3d 746 (5th Cir. 2001). In <u>Winkler</u>, the Fifth Circuit held that innocent partners were precluded from discharging debts generated by their partner's fraud even if they did not benefit monetarily from the fraud. <u>Id.</u> at 748. It noted that the language of § 523(a)(2)(A) did not include a "receipt of benefits" requirement.

The statute focuses on the character of the debt, not the culpability of the debtor or whether the debtor benefitted from the fraud. <u>See</u> Lawrence Ponoroff, <u>Vicarious Thrills: The Case for Application of Agency Rules in Bankruptcy Dischargeability Litigation</u>, 70 Tul. L. Rev. 2515, 2542 (1996) (arguing that § 523(a)(2) makes all debts that are the product of

-14-

> fraud nondischargeable). Thus, the plain meaning of the statute is that debtors cannot discharge any debts that arise from fraud so long as they are liable to the creditor for the fraud.

Id. at 749. It further cited Strang for the proposition that "benefit to an innocent partner is an aggravating factor and not a requirement to impute nondischargeable fraud liability." Id. See Tummel & Carroll v. Quinlivan (In re Quinlivan), 434 F.3d 314, 318-19 (5th Cir. 2005).

The "receipt of benefits" approach was adopted by the Sixth Circuit in BancBoston Mortg. Corp. v. Ledford (In re Ledford), 970 F.2d 1556 (6th Cir. 1992), cert. denied, 507 U.S. 916 (1993). In Ledford, the Sixth Circuit, citing Strang, concluded that a partner, innocent of active fraud, could nonetheless be subject to an exception to discharge for a debt generated by the fraud of his partner, acting in the ordinary course of the partnership's business, where the innocent partner shared in the financial benefit of the fraud. Id. at 1561-62. See Luce v. First Equip. Leasing Corp. (In re Luce), 960 F.2d 1277 (5th Cir. 1992) (distinguished in Winkler, 239 F.3d at 749-51).

The third line of authority, characterized as "knew or should have known," is represented by the Eighth Circuit's decision in Walker v. Citizens State Bank (In re Walker), 726 F.2d 452 (8th Cir. 1984). In Walker, the Eighth Circuit held with regard to a principal/agent relationship, that before an agent's fraud can be imputed to a principal-debtor, proof was required that the principal "knew or should have known of the fraud." Id. at 454.

If the debtor was recklessly indifferent to the acts of

-15-

his agent, then the fraud may also be attributable to the debtor-principal. E.g., David v. Annapolis Banking & Trust Co., 209 F.2d 343, 344 (4th Cir. 1953). . . . The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud. See In re Savarese, 209 F. [830,] 832 [(2d Cir. 1913)]; David, 209 F.2d at 344.

Thus, we agree with the district court that more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. However, . . . actual participation in the fraud by the principal is not always required. If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal. When the principal is recklessly indifferent to his agent's acts, it can be inferred that the principal should have known of the fraud.

Id. See, e.g., Reuter v Cutcliff (In re Reuter), 686 F.3d 511, 514, 518-19 (8th Cir. 2012) (Exceptions to discharge affirmed based on vicarious liability where the debtor had lent his "clean background [as a successful real estate developer] and verifiable ownership of [an] impressive office building" to the fraudulent activities of his partner.); David v. Annapolis Banking & Trust Co., 209 F.2d 343, 344 (4th Cir. 1953) (Discharge denied to debtor wife whose husband obtained a bank loan in her name. The bank refused to make the loan unless she provided a financial statement. The debtor signed a financial statement that "grossly misrepresented her financial condition," which was submitted to the bank by her husband, and her only excuse was that "she relied upon her husband, whom she allowed to carry on business in her name."); and In re Lovich, 117 F.2d 612, 614-15 (2d Cir. 1941) ("[W]e believe that when a false statement is made by an agent, some additional facts must exist justifying an inference that the bankrupt knew of the statement and in some way acquiesced in it or failed to investigate its accuracy.").

-16-

In addition, there is arguably a fourth line of circuit authority, characterized as "minimalist," that recognizes the continuing vitality of the Strang precedent, but limits its application to its specific partnership/agency context. See, e.g., Owens v. Miller (In re Miller), 276 F.3d 424, 428-29 (8th Cir. 2002) (declining to impute fraud for exception to discharge purposes under § 523(a)(2)(A) to "control persons" under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)); and Hoffend v. Villa (In re Villa), 261 F.3d 1148, 1151-54 (11th Cir. 2001) (same).

For the reasons stated in the following discussion, we explicitly adopt the "knew or should have known" standard from Walker (hereinafter referred to as the "Walker Standard") as most legally and logically appropriate and most consistent with our prior published precedents and the direction of Supreme Court and Ninth Circuit decisions.

3. Relevant Supreme Court Decisions

The Supreme Court has not recently examined the question of whether fraud liability can be imputed under § 523(a)(2)(A), but two decisions, one recent and one from approximately 15 years ago, are relevant to the disposition in this appeal.

In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court considered whether the exception to discharge in § 523(a)(6) for "willful and malicious injury by the debtor to another" could be applied to a debt resulting from medical malpractice, attributable to negligent or reckless conduct. The bankruptcy court had ruled in favor of the creditor, concluding that since the debtor doctor's treatment of the creditor was far

-17-

below an "appropriate standard of care," it qualified as "willful and malicious," and the resulting damages were excepted from discharge. After the district court affirmed, a divided Eighth Circuit en banc reversed, holding that the § 523(a)(6) exception to discharge was limited to intentional torts. The Eighth Circuit's decision was in conflict with decisions of the Sixth and Tenth Circuits. The Supreme Court accepted the case to resolve the circuit split.

The question before the Supreme Court was, "Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury . . . , or only acts done with the actual intent to cause injury?" Id. at 61. The Supreme Court concluded that establishing § 523(a)(6) nondischargeability "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." Id. (emphasis in original). Interpreting § 523(a)(6) more broadly would contravene the guiding principle that exceptions to discharge "should be confined to those plainly expressed." Id. at 62, quoting Gleason v. Thaw, 236 U.S. 558, 562 (1915).

Last year, in Bullock v. BankChampaign, N.A., 133 S. Ct. 1754 (2013), the Supreme Court considered the exception to discharge in § 523(a)(4) "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Specifically, the question was whether excepting a debt for fiduciary defalcation from discharge required a showing of the debtor's subjective bad or extremely reckless state of mind, or

-18-

would a more objective showing suffice, a question on which a number of circuits, including the Ninth Circuit, had split.

Based on its analysis of the statutory language, citing Neal, and reiterating its commitment to interpreting the exceptions to discharge narrowly, the Supreme Court held that excepting a claim for fiduciary defalcation from a debtor's discharge required that the creditor claimant establish the debtor's "culpable state of mind." Id. at 1757, 1759-60. "We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Id. at 1757.

The Geiger and Bullock decisions appear to cut strongly against applying imputed fraud under § 523(a)(2)(A) to except a debt from discharge in the absence of some showing of culpability on the part of the debtor.

4. Ninth Circuit Analysis

While the Ninth Circuit has never directly ruled on the question of whether imputed fraud liability can support an exception to discharge under § 523(a)(2)(A), it has expressed a number of views relevant to the subject in discharge exception cases. In Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini), 780 F.2d 1440 (9th Cir. 1986), a § 523(a)(6) case, one of the issues considered was whether a partner's (Cecchini's) willful conversion of the plaintiff's funds would be imputed to another partner (Robustelli) for exception to discharge purposes.

The Ninth Circuit concluded that § 523(a)(6), which, as noted above, excepts from a debtor's discharge debts for willful and malicious injury, did not require that the debtor have an

-19-

intent to injure, but rather required only that the debtor commit an intentional act leading to injury. Id. at 1442-43.

On the question of whether Robustelli's debt to the plaintiff should be excepted from his discharge, the Ninth Circuit came to the following conclusions:

> [A]lthough there is no evidence in the record concerning Robustelli's direct involvement in converting the funds, it is undisputed that Robustelli and Cecchini were partners in C.V.R. It is also undisputed that Cecchini was acting on behalf of the partnership and in the ordinary course of the business of the partnership when he converted the funds. Robustelli, at a minimum, participated in the benefits of the conversion, as evidenced by his entering into the stipulated judgment in favor of plaintiff. Therefore, applying basic partnership law, Cecchini's knowledge and intent are imputed to Robustelli. [citations omitted] We find that, as to Robustelli as well, the debt cannot be discharged.

Id. at 1444.

As discussed above, the lack of a specific intent to injure holding in Cecchini was effectively overruled by the Supreme Court in its Geiger decision. Consequently, the continued efficacy of Cecchini as precedent on related questions is compromised. However, to the extent that imputed conversion can be analogized to imputed fraud, the limited analysis in Cecchini would appear to place the Ninth Circuit in the "receipt of benefits" camp. Generally, that seems anomalous in light of the Ninth Circuit's consistent subsequent holdings that a receipt of benefits is not a required element to establish an exception to discharge for fraud under § 523(a)(2)(A). See, e.g., Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222-23 (9th Cir. 2010); Muegler v. Bening, 413 F.3d 980, 983-84 (9th Cir. 2005).

In La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d

-20-

902, 904-05 (9th Cir. 1987), a § 523(a)(2)(B) case, the Ninth Circuit panel questioned the application of imputed liability to except a debt from discharge under the standard outlined in Cecchini. However, since the Ninth Circuit ultimately concluded that the bankruptcy court did not clearly err in finding that Ms. Lansford was directly involved and bore some responsibility for the false and misleading financial statement at issue, its qualms regarding the Cecchini standard for imputing liability to except a debt from discharge are stated in dicta. See id. at 905.

Most recently, the Ninth Circuit discussed the scope of § 523(a)(2)(A) in Sherman v. Sec. & Exch. Comm'n (In re Sherman), 658 F.3d 1009 (9th Cir. 2011). The issue in In re Sherman was whether the exception to discharge in § 523(a)(19), dealing with state and federal securities frauds, extended to a debtor who "himself [was] not culpable for the securities violation that caused the debt." Id. at 1010.

In analyzing § 523(a)(19), the Ninth Circuit compared the range of other exception to discharge provisions, including § 523(a)(2)(A). In its discussion of § 523(a)(2)(A), the court stated that an underlying assumption reflected in the Ninth Circuit's § 523(a)(2)(A) decisions is that "the fraudulent conduct must have been the debtor's." Id. at 1014-15. However, the discussion does not refer either to Strang or to any of the decisions from other circuits that have wrestled with the questions as to whether or when the fraud of a partner or agent can be imputed to another partner or principal for exception to discharge purposes.

As a bottom line matter, from the foregoing discussion of

-21-

Ninth Circuit authorities that have touched on issues relevant to resolution of this appeal, we cannot predict with certainty how the Ninth Circuit would decide whether the fraud of an agent can ever be imputed to a principal for purposes of excepting a debt from discharge under § 523(a)(2)(A). However, what does seem clear is that the Ninth Circuit currently would be unlikely to follow either the "absolute" or "receipt of benefits" lines of authority.

5. Tsurukawa II and Related Opinions of this Panel

We previously have addressed the issue of imputed fraud liability for § 523(a)(2)(A) purposes in a trilogy of published opinions. In Tobin v. Sans Souci Ltd. P'ship (In re Tobin), 258 B.R. 199 (9th Cir. BAP 2001), this Panel confronted the following question: "[M]ay a fraudulent representation, imputed to an individual debtor/defendant as a corporate alter ego, be the basis for nondischargeability where there is no evidence the debtor himself made any representations to the creditor or knowingly participated in the fraudulent scheme?" Id. at 204.

The debtor/defendant was a real estate agent in a real estate development corporate business ("Corporation") that had been formed by his father. When the Corporation's business failed, its lender sued father, son and the Corporation and obtained a joint and several state court judgment against all three for fraud, among other claims. The state court made no findings as to the debtor's individual conduct, but found him liable as an alter ego, determining that there was a "unity of interest" among him, his father and the Corporation. Id. at 201. In other words, the debtor was liable not because he was an agent

-22-

of the Corporation; he was liable because, in effect, he was the Corporation. The bankruptcy court held that the state court judgment debt was excepted from the debtor's discharge, determining on summary judgment that it was bound by the state court's fraud findings as a matter of issue preclusion. Id. at 202.

The Panel reversed, noting that the Ninth Circuit had questioned application of the Cecchini standard to impute liability for exception to discharge purposes in Lansford. Id. at 205 (also citing Cal. State Bank v. Lauricella (In re Lauricella), 105 B.R. 536, 539 n.3 (9th Cir. BAP 1989)). From the record before it, the Panel further noted that the debtor had submitted a declaration in opposition to the lender's motion for summary judgment, stating that he "neither knowingly participated in the fraudulent scheme nor made representations" to the lender in connection with its loans to the Corporation. 258 B.R. at 205-06. Since the lender had not submitted any contravening evidence, summary judgment in its favor was not appropriate. Id. at 206.

On the same day it issued the Tobin opinion, this Panel issued its first opinion in a Tsurukawa appeal, Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 258 B.R. 192 (9th Cir. BAP 2001) (hereinafter referred to as "Tsurukawa I"). The debtor Etsuko Tsurukawa ("Mrs. Tsurukawa") was married to Takehiko Tsurukawa ("Mr. Tsurukawa"). Mr. Tsurukawa was employed by Nikon Precision, Inc. ("Nikon"), where his duties included managing repairs and refurbishing of parts for customers' equipment. The actual repairs were made off-site. Mr. Tsurukawa determined

-23-

whether parts in fact should be repaired, and he selected the repair facilities.  Id. at 193-94.

In 1991, Mr. Tsurukawa asked Mrs. Tsurukawa to register a business in her name, and in May 1991, she "executed and submitted an application for a fictitious business statement for High Innovation."  Id. at 194.  On the application, she represented that she was the sole owner of High Innovation and stated its mailing address as 1765 Buchanan Street, San Francisco, California.  High Innovation never conducted business at that address, and in fact, Japan Trading Company, the business that was located at the Buchanan Street address, was operated by Mrs. Tsurukawa's parents.  Id.  Mrs. Tsurukawa actually leased property at 2636 Judah Street, San Francisco, California from which High Innovation's business was run.  Id.  In 1991, Mrs. Tsurukawa also opened a bank account ("Account") for High Innovation and listed herself as the sole signatory on the Account, with the Buchanan Street address listed as High Innovation's business address.  Id.

> At some point in 1991, [Mr. Tsurukawa] began directing Nikon's repair work to High Innovation.  He represented to Nikon that High Innovation was a reputable company capable of performing repair work on Nikon's parts.  However, High Innovation did not perform the majority of the repair work.  Instead, [Mr. Tsurukawa] sent the parts to third parties and billed Nikon for the repairs at prices significantly in excess of the actual costs of the repairs.

Id.  Mrs. Tsurukawa did not participate in the management of High Innovation's business and had no business contact with Nikon. Id.

Nikon eventually discovered the High Innovation scheme and fired Mr. Tsurukawa.  State court litigation followed in which

-24-

the Tsurukawas ultimately stipulated to a judgment in favor of Nikon for $2,000,000 on Nikon's claims for "(1) fraud and deceit, (2) conversion, and (3) misappropriation of trade secrets." Id.

Mrs. Tsurukawa later filed for relief under chapter 7, and Nikon filed an adversary proceeding complaint to except the stipulated judgment debt from her discharge. After a trial, the bankruptcy court found in favor of Nikon on what this Panel interpreted as Nikon's § 523(a)(2)(A) and (a)(6) claims against Mrs. Tsurukawa. Id. at 195 n.7. The bankruptcy court's decision was supported by its following conclusions:

> [T]he wrongful acts of a spouse can be attributed to the debtor at least where the following facts are established: (1) the debtor participates significantly in the operation of the business; (2) the wrongful conduct of the spouse occurs in the ordinary course of the operation of that business; (3) the debtor has reason to suspect that the spouse is engaged in wrongful activity; (4) the debtor enjoys benefits from the wrongful activity; and (5) no unusual circumstances make it unjust to attribute the wrongful conduct of the spouse to the debtor.

Id. at 195.

The issue before the Panel in Tsurukawa I was "[w]hether the wrongful conduct of one spouse can be attributed to the other spouse for purposes of nondischargeability of debt under § 523(a)." Id. After considering Neal, Strang, various circuit authorities, including Cecchini and Lansford, and the legislative history of § 523(a)(2)(A), the Panel answered that question in the negative. "[W]e hold that a marital union alone, without a finding of a partnership or other agency relationship between spouses, cannot serve as a basis for imputing fraud from one spouse to the other." Id. at 198. The Panel reversed and remanded the adversary proceeding to the bankruptcy court to

-25-

determine "whether (1) an agency relationship existed between [the Tsurukawas] or (2) [Mrs. Tsurukawa] had the requisite fraudulent intent to deceive Nikon." Id.

Following remand, the bankruptcy court found that a business partnership and agency relationship existed between Mr. and Mrs. Tsurukawa supporting an exception to discharge judgment against Mrs. Tsurukawa under § 523(a)(2)(A), thereby setting the stage for this Panel's decision in Tsurukawa II.

The factual background summarized in Tsurukawa II tracked the factual summary in Tsurukawa I with the addition that the Tsurukawas used much of the money received through High Innovation for "personal consumption, such as buying two additional houses and new cars." 287 B.R. at 519. The legal issue on which the Tsurukawa II Panel focused was whether "fraud may be imputed to a spouse under partnership/agency principles in a § 523(a)(2)(A) action." Id. at 520.

After concluding that the bankruptcy court did not clearly err in its fact findings that the Tsurukawas were in partnership together and that Mr. Tsurukawa acted as the partnership's agent, the Panel again examined the legislative history of § 523(a)(2)(A), Neal, Strang, and various circuit and other authorities, again including Cecchini and Lansford, and comparing the Panel's prior recent opinion in Tobin. After a careful and thorough review, the Panel ultimately concluded that married business partners are liable for their mutual partnership obligations "under well-established agency principles." Id. at 527. Accordingly, it held "that fraud may be imputed to a spouse under partnership/agency principles in a § 523(a)(2)(A) action"

-26-

and affirmed the bankruptcy court's judgment. Id.

Although this Panel did not expressly base its conclusions in Tobin, Tsurukawa I and Tsurukawa II on the Walker Standard, the dispositions in all three decisions are consistent with application of the Walker Standard.

B. The Current Appeal

The bankruptcy court stated two rationales for its decision: First, "[t]his idea of imputation simply is not what Congress intended. And that's my understanding of the law." October 2, 2012 Hr'g Tr. at 1:24-2:1. Based on the foregoing historical analysis and discussion, we disagree, but our disagreement on that point is not dispositive in this appeal.

The second rationale for the bankruptcy court's decision in this case is, even if fraud liability can be imputed for purposes of § 523(a)(2)(A) in certain circumstances, it is not appropriate to do so where the debtor and the person who committed active fraud have no more than a principal-agent relationship. We are not comfortable concluding that under no circumstances can the fraud of an agent be imputed to his principal for exception to discharge purposes under § 523(a)(2)(A). However, based on the reasoning in the cases decided by the Supreme Court, the Ninth Circuit and other courts, as discussed above, debts incurred as the result of the debtor's agent's fraud should not be excepted from discharge unless the debtor is culpable. See, e.g., Bullock v. BankChampaign, N.A., 133 S. Ct. at 1757; and Sherman, 658 F.3d at 1014-15. Accordingly, as stated above, we adopt the Walker Standard.

Under that standard, more than a principal/agent

-27-

relationship is required to establish a fraud exception to discharge. While the principal/debtor need not have participated actively in the fraud for the creditor to obtain an exception to discharge, the creditor must show that the debtor knew, or should have known, of the agent's fraud. Because this standard focuses on the culpability of the debtor, and not solely on the actions of the agent, we think it most properly comports with the recent holdings of the Supreme Court and the Ninth Circuit regarding discharge exceptions. While this conclusion does not adopt the second rationale propounded by the bankruptcy court in support of its decision, we nonetheless can and will affirm its decision based on its unchallenged findings of fact supporting discharge under the Walker Standard.

In the Amended Judgment, the State Court held Huh vicariously liable for Kim's fraud as a sales agent for America Realty & Investment. The Amended Judgment is final, but it is not necessarily dispositive in this case because the interpretation of exceptions to discharge under the Bankruptcy Code, while informed by relevant state law, ultimately is a matter of federal law. See Grogan v. Garner, 498 U.S. at 284 ("Since 1970, . . . the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code."), citing Brown v. Felsen, 442 U.S. 127, 129-30, 136 (1979).

The bankruptcy court made the following specific findings with respect to Huh's knowledge and conduct concerning Sachan's acquisition of the Market:

1) Huh never communicated with Sachan or any

-28-

representative of his corporation regarding purchase of the Market.

2) Huh never made any representations to Sachan or any representative of Sachan's corporation regarding purchase of the Market.

3) Prior to the sale of the Market, Huh was not even aware of the Market and certainly was not aware of any defects in the Market or whether it was generating profits or not.

4) Huh was not aware of the Sachan/Orion Sachan Corporation purchase of the Market until after the sale closed on March 2, 2005.

None of these fact findings has been challenged as erroneous on appeal. In addition, the record reflects that a substantial majority of the economic benefits to the broker from the Market sale went to Kim individually ($38,750 or 97.3%), rather than to Amerity, Inc. or Huh personally ($1,080 or 2.7%).

In these circumstances, mindful of the admonition to interpret the exception to discharge provisions of the Bankruptcy Code narrowly in favor of the debtor and against creditors, we conclude that the record does not establish that Huh knew or had reason to know of any misrepresentations made by Kim to Sachan or Orion Sachan Corporation with respect to the Market. In fact, Huh was not aware of the Market or of Sachan's interest in acquiring it until after the purchase closed. Based on the bankruptcy court's fact findings, we cannot conclude that Huh knew or should have known of the frauds of his agent, Kim, in this case.

Accordingly, we hold, applying the Walker Standard, that imputing Kim's fraud to Huh for exception to discharge purposes under § 523(a)(2)(A) where Huh did not know or have reason to know of his agent's fraud, is not consistent with the provisions

or objectives of the Bankruptcy Code.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's judgment dismissing Sachan's § 523(a)(2)(A) claim against Huh.