In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3213

BRIAN T. SULLIVAN,

*Plaintiff-Appellant*,

*v.*

MICHELE A. GLENN and MICHAEL R. GLENN, JR.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 329 — **James B. Zagel**, *Judge*.

ARGUED FEBRUARY 10, 2015 — DECIDED APRIL 2, 2015

Before POSNER, MANION, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal presents a pair of questions of bankruptcy law: whether, if a debt is the result of fraud, the debtor can discharge the debt in bankruptcy if he was not complicit in the fraud; and whether he can discharge the debt even if the fraud was created by his agent, provided, again, that the debtor himself was not complicit in it.

The defendants, the Glenns, were in the real estate development business. In 2007 they encountered financial difficulties and asked a loan broker named Karen Chung to try to get them a short-term loan of $250,000. She asked a lawyer named Brian Sullivan, of whom she was a friend and an occasional client, whether he'd be interested in making such a loan. He was, and agreed to lend the Glenns the $250,000 repayable in two to three weeks with interest of $5,000 per week. The Glenns needed the money for more than two weeks, but Chung told them and Sullivan that a bank had agreed to give the Glenns a $1 million line of credit, though it would take a few weeks for the line of credit to become available—hence the need for the "bridge" loan from Sullivan, which the Glenns would easily be able to repay as soon as they could draw on the line of credit.

At the meeting in the fall of 2007 at which these arrangements were discussed, Sullivan asked about the current status of the bank loan. One of Chung's employees stepped out of the room, ostensibly to call the bank. When he returned he told Sullivan that the bank had indeed approved the $1 million line of credit. In fact, as Chung well knew, her employee hadn't called the bank and the line of credit had not been (and never was) approved—indeed it had never been applied for. Sullivan was left in the dark. But before the meeting broke up he asked and eventually received promissory notes from the Glenns and from Chung, committing them personally to repay his $250,000 loan if repayment was not made from the bank's line of credit.

The loan was never repaid. Chung declared bankruptcy. Sullivan filed an adversary complaint against her in the bankruptcy proceeding, claiming that she was not entitled to

discharge the debt to him created by her promissory note because it was her fraudulent assurance that the bank line of credit had been approved that had induced him to make the $250,000 loan secured by promissory notes including Chung's. The Bankruptcy Code bars discharge of an individual debtor for a debt "obtained by … false pretenses, a false representation, or actual fraud … ." 11 U.S.C. § 523(a)(2)(A). So the court refused to grant Chung her discharge.

The Glenns had also declared bankruptcy, and Sullivan had filed similar adversary complaints against them, which were consolidated. But in the consolidated proceeding the bankruptcy judge found that neither of the Glenns had committed fraud, and he refused to impute Chung's fraud to either of them under an agency theory argued by Sullivan— he ruled that Chung had not been the Glenns' agent. He also rejected two alternative arguments of Sullivan—that if a debt is a product of fraud even the debtor's complete innocence is nevertheless no defense to the nondischargeability of the debt, and that Glenn had committed fraud rather than being simply the innocent beneficiary of Chung's fraud and his fraud had enabled the Glenns to induce Sullivan to make the bridge loan. The bankruptcy judge therefore concluded that the Glenns' debt to Sullivan was dischargeable, precipitating this appeal to us.

Sullivan's "debt not the debtor" theory is consistent with the language of the fraud exception to discharge, quoted above. But this just illustrates the limitations of literal interpretation of statutory language. If his interpretation were correct, then had Chung assigned the debt that she owed to Sullivan to some innocent third party, who as a result of the

assignment became a debtor of Sullivan and later went bankrupt, the assignee could not discharge the debt in bankruptcy, because the debt had originated in fraud—even if Chung had lied to the assignee about the debt's fraudulent origin. That would make no sense. It would be a form of attainder: an innocent person punished for the misdeed of an ancestor, or in this case an assignor.

Sullivan's alternative theory, based on the law of agency—that Chung was the Glenns' agent and the misdeeds of the agent within the scope of the agency are imputed to the principal—has greater promise. The Glenns deny that Chung was their agent. They argue that as a loan broker Chung was an independent contractor. But if you hire someone to negotiate a deal for you, subject to your approval, that someone is your agent. *Petty v. Cadwallader*, 482 N.E.2d 225, 228 (Ill. App. 1985) (Illinois law); *Whitley v. Taylor Bean & Whitacker Mortgage Corp.*, 607 F. Supp. 2d 885, 903–04 (N.D. Ill. 2009) (same); *First National Bank v. El Camino Resources, Ltd.*, 447 F. Supp. 2d 902, 910 (N.D. Ill. 2006) (same); *Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1348–50 (8th Cir. 1980) (Missouri law). In addition, the principal is liable for a misrepresentation made by its agent if the person to whom the misrepresentation was made would have no reason to doubt that it was a true statement, authorized by the principal. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–68 (1982).

But the issue in this case is not the Glenns' liability to Sullivan, which is anyway fully grounded on their promissory notes, making any vicarious tort liability that might be imposed on them irrelevant. The issue is whether their agent's fraud is grounds for denying them their discharge in bank-

ruptcy. Sullivan is emphatic that it is. His opening brief de-
clares that "nondischargeability … does not turn on whether
the debtor himself did something bad"—"guilt or innocence
has nothing to do with it." In other words you can do noth-
ing bad but still be denied a discharge in bankruptcy—no
fresh start for the innocent. As Sullivan nostalgically re-
marks, "Contrary to popular belief, bankruptcy was initially
created for the benefit and protection of creditors, not debt-
ors." Yes, and debtors used to be sent to prison.

We don't think that Chung's fraud should result in the
denial of the Glenns' discharge in bankruptcy. "Proof that a
debtor's agent obtains money by fraud does not justify the
denial of a discharge to the debtor, unless it is accompanied
by proof which demonstrates or justifies an inference that
the debtor knew or should have known of the fraud." *In re
Walker*, 726 F.2d 452, 454 (8th Cir. 1984). That condition for
denial of the discharge is not satisfied in this case. Moreover,
Sullivan, the victim of the fraud, was in as good a position as
the Glenns to have detected it before it could have done any
harm.  All he would have had to do—and should have done
anyway, as a matter of elementary precaution—before mak-
ing a $250,000 loan was to call the bank for verification that
the Glenns' line of credit—the *sine qua non* of his being as-
sured of repayment of his bridge loan—had been approved.
If the bank refused to give him the information without
Glenn's approval, he had only to ask Glenn for that ap-
proval. Sullivan had to have known that if the line of credit
hadn't been approved, his chances of being repaid his bridge
loan would plummet. He may have realized this—such re-
alization may have been the reason for his insisting on
promissory notes from the Glenns and Chung. But he should
have called the bank, since if it confirmed the issuance of the

line of credit he would have less need for those notes—and since if the Glenns and Chung were unable to pay the notes and declared bankruptcy and were discharged in bankruptcy he would have little chance of collecting the Glenns' debt to him. He thus is mistaken to say that the Glenns "were in a far superior position than [he] to prevent the fraud from happening in the first place."

This is not to say that Chung would have been entitled to a discharge in bankruptcy of a debt owed to Sullivan, on the ground that Sullivan should have protected himself against any possible fraud by her or the Glenns by asking the bank whether it had authorized the loan to the Glenns. As between fraudulent and careless, careless wins. *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 672, 675–76 (7th Cir. 1995). But the question is whether the Glenns, who have not been shown to be careless in hiring and relying on Chung, should lose their discharge in bankruptcy to Sullivan, who would not have lost his $250,000 had he exercised even slight care.

Sullivan was eager to make the loan; it constituted a very lucrative opportunity. A loan of $250,000 outstanding for a year that pays $5,000 in interest every week will return the lender $260,000 in interest (52 weeks times $5,000 per week) over the course of the year. The aggregate interest will be 104 percent of the principal of the loan. It's not every day that one is offered interest on a loan at an annual rate of 104 percent (not that the loan was expected to be outstanding for anywhere near a year). It appears, moreover, that in agreeing to make the loan Sullivan was relying not only on Chung's being the borrowers' agent but also on his friendship with her. His opening brief describes the two as "good friends," and at the trial he described them as "very good

friends." That they were "good friends" or "very good friends" tarnishes Sullivan's agency theory. He may have been trusting her more as a friend than as the Glenns' agent.

We go further: Sullivan's dealings with Chung bordered on the irrational. Before he made the bridge loan to the Glenns he had lent her $30,000, which she did not repay. After the bank deal failed to close on time he lent her another $30,000. And after he learned that the bank had not authorized the line of credit he lent her $35,000 more. (So far as we know, neither of those loans was repaid, either.) Until the fraud was exposed he was putty in her hands.

It's true as he argues that imposing liability for benefiting however innocently from a fraud would make debtors, such as the Glenns (who benefited by getting the bridge loan from Sullivan), police their agents more carefully. But it would also increase the complexity and cost of commercial transactions. Bankruptcy creates a form of limited liability, which encourages transacting. Withdrawing the option of a discharge in bankruptcy thus increases transactional risk for debtors. So it's a wash—there is, so far as we can determine, no net social benefit to be obtained by embracing the positions urged by Sullivan.

*In re Walker*, *supra*, 726 F.2d at 454, holds that a principal, such as Glenn, of an agent who commits fraud forfeits his right to a discharge in bankruptcy only if he "knew or should have known of the agent's fraud" or "was recklessly indifferent to the acts of his agent." To the same effect see, besides cases cited in *id.*, *In re Huh*, 506 B.R. 257, 266–71 (9th Cir. BAP 2014). Some cases lean the other way, see *In re Bonnanzio*, 91 F.3d 296, 302–03 (2d Cir. 1996); *In re Cohn*, 54 F.3d 1108, 1119 (3d Cir. 1995); *In re Lansford*, 822 F.2d 902, 904–05

(9th Cir. 1987), but no appellate court has actually rejected *Walker*. Granted, the *Walker* standard is a bit mushy; if it's enough to deny the discharge that the principal "should have known of the agent's fraud," there will never be an occasion for requiring proof of reckless indifference. No matter; there's no indication that Glenn was aware, or should have been aware, of Chung's fraud.

In any event, Sullivan didn't try to meet the standard of *Walker*. Instead, twanging the second string of his bow, he assumed the heavier burden of trying to show that Michael Glenn was guilty of fraud because he "knew, or had to know, that the [Bank] Loan never existed and therefore could never be a source of funds to pay off the Sullivan Loan." Obviously if Glenn was guilty of fraud he cannot discharge his $250,000 debt (based on his promissory note) to Sullivan in bankruptcy. But Glenn testified without contradiction that his usual method of obtaining bank loans was just to email a loan request to a bank, rather than to submit a formal loan application, and that he would receive informal notice of approval of his application before receiving documentary confirmation. So when Chung's employee told him that the bank had confirmed over the phone its approval of the line of credit sought by the Glenns, Glenn had no reason to doubt that the line of credit had indeed been approved and that therefore Sullivan's bridge loan would be repaid.

Sullivan further argues that Glenn told him that "a large portion" of the bridge-loan money would be used forthwith for grading and for asphalt paving at a construction site, but that in fact all the money was used to pay off creditors. Sullivan claims that had he known the money was to be used to pay off creditors he would not have made the bridge loan

but instead would have told Glenn to hold off paying the creditors until he could draw on the bank's line of credit. This is another argument that doesn't make sense. Why would Sullivan have given up $10,000 or $15,000 in interest, regardless of what use Glenn would put the proceeds of the bridge loan to?

And by the way, there is no keeping Karen Chung down. See Special Learning: A Leader in Providing Digital Training and Educational Solutions to the Autism and Special Needs Communities Across the Globe, "Karen Chung, CEO and Founder," www.special-learning.com/about; Beth Pitts, "Karen Chung, Serial Entrepreneur, on Bringing Autism Services into the 21st Century," *The Next Women*, July 31, 2012, www.thenextwomen.com/2012/07/31/karen-chung-serial-entrepreneur-bringing-autism-services-21st-century (both websites were visited on April 1, 2015).

But the important thing of course is that the bankruptcy judge and the district judge were right to reject Sullivan's contention that the Glenns' debt to him was not dischargeable in bankruptcy.

AFFIRMED.