FILED

MAY 28 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-13-1077-PaKiLa |
| | CC-13-1078-PaKiLa |
| JOHN A. OBARA and MYRNA CASTRO, | (Related Appeals) |
| | Bankr. No. 09-13962-VK |
| Debtors. | Adv. Proc. 09-01239-VK |
| JOHN A. OBARA; MYRNA CASTRO, | |
| Appellants, | |
| v. | **M E M O R A N D U M**[1] |
| AFC CAL, LLC, | |
| Appellee. | |

Argued and Submitted on May 15, 2014
at Pasadena, California

Filed - May 28, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Charles E. Rendlen, III, Bankruptcy Judge, Presiding[2]

Appearances:     Raymond H. Aver argued for appellant Myrna Castro; Charles Shamash of Caceres & Shamash, LLP argued for appellant John A. Obara; Tom Roddy Normandin of Prenovost, Normandin, Bergh & Dawe, APC argued for appellee AFC CAL, LLC.

---

   [1]  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

   [2]  Judge Rendlen, United States Bankruptcy Judge for the Eastern District of Missouri, as a visiting judge, presided over the trial and entered the judgment on appeal.

Before: PAPPAS, KIRSCHER and LATHAM,[3] Bankruptcy Judges.

Appellants, chapter 7[4] debtors John A. Obara ("Obara") and Myrna Castro ("Castro" and, together, "Debtors") appeal the order of the bankruptcy court determining that their debt to AFC CAL, LLC ("AFC") was excepted from discharge under both § 523(a)(2)(A) and § 523(a)(6). We AFFIRM in part and REVERSE in part regarding the determination under § 523(a)(2)(A), and AFFIRM the determination under § 523(a)(6).

## FACTS

### Background

Beginning in 2003, Debtors owned and operated Superior 1 Auto Sales ("Superior"). AFC Cal, LLC, a car dealership financing group, extended a modest flooring line of credit to Superior.

In 2005, Debtors formed JM Automotive Group, Inc. ("JMAG"), to serve as the corporate entity for a new car dealership. While Superior ceased to exist as a separate company in 2007 when Kia granted Debtors a new car franchise, Debtors continued to use Superior as a d/b/a for JMAG.

Castro was president of JMAG; Obara, her spouse, was its

---

[3] Hon. Christopher B. Latham, United States Bankruptcy Judge for the Southern District of California, sitting by designation.

[4] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all Civil Rule references are to the Federal Rules of Civil Procedure 1–86.

-2-

director of operations.[5] AFC gave JMAG a $2.5 million flooring line of credit in 2007 to acquire new cars, and a $1.5 million flooring line for used cars. These credit lines were evidenced by promissory notes and were secured by security agreements (collectively the "JM Automotive Notes") covering each new and used car financed by AFC, together with the proceeds of those sales.

Under this arrangement, when JMAG placed orders for new cars, Kia would directly draw on the $2.5 million line. When JMAG purchased used cars at an auction, the invoices were sent to AFC, and AFC would pay for them from the $1.5 million line. When AFC financed a vehicle, Kia would deliver the Manufacturer's Statement of Origin ("MSO") to AFC, or the auction would send the used car title to AFC. AFC retained the title or MSO until the vehicle was paid off. When JMAG received the title or MSO from AFC, it would submit it for registration to the California Department of Motor Vehicles ("DMV"). Obara and Castro were

[5] At oral argument before the Panel, Obara's counsel contended that Obara was not involved in managing daily operations at JMAG, and that another person was director of operations. However, this conflicts with Obara's trial declaration, where he stated: "I was the Director of Operations at JM Automotive." Obara Dec. at 2, ¶ 6, November 14, 2011. Obara also confirmed that he was JMAG director of operations in trial testimony: "As a director of operations, I never saw the bank statements." Trial Tr. 208:18-209:2, March 6, 2012.
Counsel also insisted that "John Obara, rather than being a sophisticated evil mastermind, was nothing more than a kid, a guy in his mid-20s, a go-getter, who was thrust in way over his head." However, Obara testified at trial that he had approximately twenty years of experience in the auto sales industry. Trial Tr. 230:23-25, 174:13-178:16, March 6, 2012.

-3-

guarantors on the AFC debts. Both would admit at trial that they did not retain the proceeds of the cars sold subject to AFC's flooring lien in trust and, instead, used those proceeds to pay operating expenses.

There were several minor defaults on the AFC loans in 2007 and 2008. However, the bankruptcy court would later determine that none of the defaults raised the sort of "red flags" that would have alerted AFC to potential financial difficulties at JMAG.

Since 2005, a third party, AutoVin, performed on-site monthly audits for AFC concerning JMAG's operation. Among other things, an audit included a physical count and inspection of the cars on the lots, a review of sales receipts, and reconciliation of Debtors' records. Any discrepancies were noted in an audit report (e.g., vehicles that were "off lot" for repairs or test drives, sales information, sales proceeds not received from third party finance companies, etc.). Debtors were then allowed five days after receipt of the audit report to explain and provide information to the auditor or AFC concerning any audit discrepancies, to thereby "close" the audit. Before September 2008, debtors successfully passed audit forty times, and only failed once, and that audit failure was ultimately resolved in their favor.

### The September Audit and the Repossession

As part of a review of the accounts, AFC required that Debtors submit to AFC a written "Statement of Net Worth" as well as tax returns. The statement Debtors gave to AFC represented that their net worth was $3,684,842 on August 30, 2008. At

trial, they both admitted that this statement was false, in that their net worth was at the time probably $2 million less than what was represented.

In addition, on September 18 and 19, 2008, AutoVin conducted a monthly audit of Debtors' dealership. Based upon information given to him, the auditor noted in his report that there were a significant number of "unverified" vehicles, which he was lead by JMAG representatives to believe were either "sold unpaid," on "test drive," or considered "demos."

AFC's representative supervising Debtors' account, Zach Sterling ("Sterling"), testified at trial that he received the auditor's report on September 20, 2008, and noted the discrepancies between the audit report and AFC's records concerning the numbers of vehicles which should be accounted for at the dealership. When Sterling was unable to confirm the car sales with third party financing companies listed in the auditor's report, he went to the dealership on Wednesday, September 24. He met with Castro to discuss the discrepancies, and to inquire when the audit would be closed. She told him that she was compiling the records needed to close the audit, but that the dealership's computers were down. Sterling made a detailed, visual inspection of the lot, and confirmed that the car numbers were consistent with the audit report. Sterling also spoke to Obara at least once on September 24, 25, and 26, but it is disputed what was said.

Between September 23 and 25, 2008, twenty-five automatic clearing house ("ACH") transfers issued by JMAG from its bank account to AFC were dishonored by the bank, totaling $78,000.

-5-

During this same time, Castro made withdrawals from JMAG's business bank accounts totaling $142,000. Sterling returned to the dealership on Thursday, September 25, 2008 to again question why the audit had not been closed, and to find out the reason for the dishonored payments.

At that time, Castro assured Sterling that she was working diligently on the audit, and that the dishonored payments must have been the result of a bank error. Sterling again made a visual examination of the lot and found the results consistent with the auditor's report.

On Friday, September 26, 2008, Sterling again returned to the dealership. He and Castro then went together to the bank branch that handled the JMAG accounts, where a bank officer advised Sterling that the dishonored payments to AFC were "possibly a bank error."[6] Sterling would later testify that, upon returning to the dealership, Castro appeared to have made several payments by computer to AFC. All payments made on September 26 were later dishonored by the bank. As was later revealed, twenty-four computer payments made by JMAG to AFC on September 30, 2008, were also dishonored, totaling $212,549.47.

Sterling returned to the dealership on Monday, September 29, 2008. Upon his arrival, he received a cell phone call from a person who identified himself as Don Lake, an attorney for JMAG, who informed him that JMAG was "out of business," and that all

---

[6] Sterling would testify that he was later contacted by the bank, and was informed that the dishonored ACH orders were not the result of bank error, but occurred because JMAG had stopped payment on the transfers.

-6-

further inquiries should be directed to the attorney. Sterling conducted a visual inspection of the lot and determined that forty-nine vehicles that had been on the lot from September 18 through 26 were now gone.

When Sterling confronted Obara at the dealership about the missing vehicles, Obara refused to give him any explanation, and told Sterling to speak with Obara's attorney. According to Sterling's trial testimony,

Q:       What did Mr. Obara say to you [on September 29] and what did you say to him?

Sterling: My very first question to him is, John, what's going on? We just showed up and we noticed that there's a lot of cars missing, and we need to talk to you and figure out what's going on here.

Q:       What did Mr. Obara say?

Sterling: He said did you receive a call from my attorney, and I responded with yes, that we had.

Q:       And what did he say to that?

Sterling: He said, well, then that's what you're going to have to do. You're going to have to refer any questions to him. I'm not talking to you.

Trial Tr. 49:8-20, January 11, 2012.

Sterling immediately ordered that all remaining vehicles on the lot be repossessed. The evidence at trial would show that the forty-nine "missing" cars had all been sold over the weekend of September 27-28, 2008, by JMAG through Prime Auto Auction, for prices that were less than the outstanding debt owed on the cars to AFC. Obara and Castro have never fully accounted for the proceeds of those sales. AFC filed a complaint against Debtors in the California Department of Motor Vehicles. In an

-7-

administrative decision entered on July 7, 2011, the DMV determined that the purchasers of at least twenty of the forty-nine vehicles in dispute had not been able to obtain good title because Debtors had not paid the liens on the vehicles to AFC.[7]

### The Bankruptcy and Adversary Proceeding

Obara and Castro filed a joint petition for relief under chapter 7 on April 7, 2009.

AFC filed an adversary complaint against Debtors on July 9, 2009; a First Amended Complaint ("FAC") was filed on November 9, 2009. In it, AFC sought an exception to discharge for the debts owed by Debtors to AFC under §§ 523(a)(2)(A) and (B), and § 523(a)(6), and asked that Debtors' discharge be denied under §§ 727(a)(2), (a)(4), (a)(5) and (a)(7). Debtors filed an answer to the FAC on February 22, 2010, generally denying its allegations.[8]

AFC submitted a pretrial brief on July 18, 2011. To support its claim for an exception to discharge under § 523(a)(2)(A), AFC alleged that Debtors provided false and misleading information to AFC regarding the status of vehicles missing from the dealership lot on September 18 and 19, 2008, that numerous checks from JMAG to AFC were dishonored, and that forty-nine vehicles on the lot

---

[7] The bankruptcy court would determine that the DMV decision was not entitled to preclusive effect concerning the issues raised in the adversary proceeding, a conclusion the parties have not challenged in this appeal.

[8] AFC's motion for summary judgment in the adversary proceeding was denied by the bankruptcy court after a hearing on October 28, 2010. That order has not been appealed.

during the audit were missing on September 29, 2008. Concerning its allegations under § 523(a)(6), AFC argued that JMAG had converted a total of 170 vehicles that Debtors knew were subject to AFC liens, and did so willfully and maliciously to injure AFC and its property.[9]

Debtors submitted a pretrial brief on September 19, 2011. As to § 523(a)(2)(A), Debtors denied making any false representations to the auditor during the audit of September 18 and 19, 2008. As to § 523(a)(6), Debtors denied that there had been any conversion of AFC's property.

Trial in the adversary proceeding took place on January 11, March 6, March 7, and November 13, 2012. The witnesses who testified included Sterling, Obara, Castro, John Durazo (the AutoVin auditor who conducted the inspections/audits on September 18 and 19, 2008), Gabriela Otworth (bank branch manager), and Efren Martinez (an auto registration service agent). At the close of trial, the bankruptcy court requested additional briefing from the parties to address, among other things, why AFC continued to hold 165 titles and MSOs, the course of dealing between AFC and Debtors concerning payments and defaults on the flooring line, and Debtors' record-keeping practices.

AFC argued in its post-trial brief that it was AFC's practice to withhold titles and MSOs from car purchasers until

---

[9] We do not discuss here the parties' arguments concerning AFC's claims under § 523(a)(2)(B) and § 727(a), because those claims were dismissed by the bankruptcy court and those dismissals have not been appealed.

-9-

its lien was satisfied. As to course of dealing, AFC contended that it was not aware of any serious financial difficulties of JMAG before the events of late September 2008. And, AFC insisted, Debtors poorly maintained records, could not provide the bankruptcy court with records because they had intentionally sold the computers where the records were kept, and had not kept copies or backup.

Rather than address the bankruptcy court's specific questions, Debtors' post-trial brief repeated their general arguments why AFC had not satisfied its burden of persuasion on the elements of §§ 523(a)(2)(A) and (a)(6).

The bankruptcy court entered a Memorandum and Opinion on February 8, 2013 ("Memorandum"). After a discussion of the facts, the court made the following findings and conclusions:

- "Defendants are personally liable for JM Automotive's Obligations."

- "Defendants made misrepresentations to plaintiff with knowledge of falsity and intent to deceive."

- "Plaintiff justifiably relied on Defendant's representations."

- "Plaintiff was damaged in the amount of $2,000,688.00, proximately caused by plaintiff's reliance on Defendant's misrepresentations."

- "The court finds that Plaintiff has established all five elements required under § 523(a)(2)(A) by a preponderance of the evidence."

- "The elements of conversion [under California and bankruptcy law] are met."

-10-

- "JM Automotive's conversion of the one hundred and seventy vehicles was willful and malicious."

- "Plaintiff has established the requirements for a finding under § 523(a)(6) by a preponderance of the evidence."

In the judgment, also entered on February 8, 2013, the bankruptcy court determined that $2,000,688.00, the balance due on JMAG's debts to AFC, was excepted from discharge under §§ 523(a)(2)(A) and (a)(6). The bankruptcy court granted judgment in favor of Debtors on the § 727(a) claims, and ruled that "all other requests for relief be denied."

Debtors each filed a timely notice of appeal.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in determining that the debt owed by Debtors to AFC was excepted from discharge under § 523(a)(2)(A) and § 523(a)(6).

## STANDARD OF REVIEW

In reviewing a bankruptcy court's determination of an exception to discharge, we review its findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

///
///
///
///

-11-

## DISCUSSION

### I.

**The bankruptcy court did not err in determining that the debt owed by Debtors to AFC is excepted from discharge under § 523(a)(2)(A), but the court's determination of the amount of damages proximately caused by Debtors' fraud was clearly erroneous.**

Section 523(a)(2)(A) provides:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt— . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

To establish a claim for an exception to discharge under this provision requires a creditor to demonstrate the existence of five distinct elements by a preponderance of the evidence: (1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. Ghomesh v. Sabban (In re Sabban), 600 F.3d 1219, 1221 (9th Cir. 2010); Siriani v. Nw. Nat'l Ins. Co. of Milwaukee, WI (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992). However, even assuming these elements are satisfied, a creditor will not be entitled to an exception to discharge under § 523(a)(2)(A) if the debtor's fraudulent representations consist of "statement[s] respecting the debtor's or an insider's financial condition . . . ." Heritage Pac. Fin., LLC v. Edgar (In re Montano),

-12-

501 B.R. 96, 102 (9th Cir. BAP 2013).

## A. False Representations

In its Memorandum, the bankruptcy court cites examples of misrepresentations by Obara and Castro on which AFC justifiably relied. First, the court found that,

> Defendants signed the JM Automotive Notes dated August 7, 2007. When Defendants signed the documents, they made representations and warranties that JM Automotive would provide a complete accounting of the financed vehicles and remit the requisite sales proceeds due to Plaintiff in accordance with the terms of the JM Automotive Notes. The representations were material and induced Plaintiff to extend the flooring line of credit.

Memorandum at 20.

Given the context of this action, it is not clear why the bankruptcy court included this representation in discussing Debtors' conduct. The representation it cites as problematic was made in the contract documents executed in 2007, before JMAG was apparently experiencing any financial problems. Indeed, according to the evidence, JMAG had successfully navigated forty audits before August 2008. There is nothing in the record to suggest that Debtors' representations to faithfully account for financed vehicles, and any proceeds of sale, nearly a year before Debtors' questionable behavior occurred in September 2008, were falsely made to deceive AFC at the time they were made.

The other two representations targeted by the bankruptcy court took place in connection with Debtors' delivery of their Statement of Net Worth, dated August 29, 2008, to AFC, and Debtors' false statements made to the auditor in connection with the September 18 and 19, 2008 audit.

-13-

JM Automotive provided false information to the lot auditor during the September 2008 audit. While Defendants maintain that they did not personally provide the lot auditor with any information, the lot auditor specifically identified certain vehicles as "sold unpaid" or "test drive" or on "demo." The only reasonable conclusion is that a representative of JM Automotive provided the auditor with this false information . . . . Defendants' arguments as to the August 29, 2008 Statement of Net Worth and the September lot audit are disingenuous. Having intentionally provided the false Statement of Net Worth to Plaintiff and false statements to the lot auditor, it is not a defense to assert that the misconduct should have been discovered or should not have been relied upon . . . . JM Automotive's fraudulent conduct is attributable to Defendants[.]

Memorandum at 22-23.

Of course, to the extent that the bankruptcy court deemed the Statement of Net Worth to be a false representation which could support an exception to discharge under § 523(a)(2)(A), the court erred.[10] Even if its contents were false, and Debtors intended to defraud AFC through its contents, AFC's use of this statement is not actionable since "[b]y its terms, § 523(a)(2)(A) excludes 'a statement respecting the debtor's or an insider's financial condition.'" In re Montano, 501 B.R. at 102; Tallant v. Kaufman (In re Tallant), 218 B.R. 58, 69 (9th Cir. BAP 1998). The bankruptcy court dismissed AFC's § 523(a)(2)(B) claim for Debtors' use of false financial information, and AFC has not appealed that aspect of the judgment.

On the other hand, we agree with the bankruptcy court that

---

[10] At argument before the Panel, counsel for AFC conceded that the Statement of Net Worth could not serve as the basis for an exception to discharge under § 523(a)(2)(A), but suggested that it was probative of willful and malicious conduct under § 523(a)(6).

-14-

false information given by Debtors to the lot auditor, or to Sterling, either directly or through JMAG employees, could constitute representations adequate to support a discharge exception under § 523(a)(2)(A). In this regard, the Memorandum recites:

> The Court finds that there is sufficient evidence that Defendants directly participated in or consented to the alleged fraud[ulent representations]. At all time, Defendants were the sole owners, directors and officers of JM Automotive. As signatories to the JM Automotive Notes, Defendants were aware of JM Automotive's obligations to Plaintiff. Defendants testified extensively as to their course of dealing with Plaintiff evidencing knowledge of JM Automotive's operations and activities. Obara was involved in the process of acquiring the vehicle at auction and selling them at JM Automotive. Therefore, Obara knew the sales status of vehicles financed by Plaintiff. If a vehicle, financed by Plaintiff, was sold or remained on the lot, Obara knew about it. Obara and Castro are specifically identified as having met with the AutoVin auditor in lot audit reports. Obara knew that an incorrect accounting of the vehicles had been provided during the September 2008 lot audit. Obara failed to take appropriate action to correct the wrong.

Memorandum at 19-20.

While Debtors each urgently argue to the contrary, the bankruptcy court found, based upon the disputed evidence, that Obara and Castro both effectively made false representations as part of the audit process about the status of the JMAG vehicles. To the extent they personally made false statements to the auditor or to Sterling, they are accountable under § 523(a)(2)(A) for direct, actual fraud. Tobin v. San Souci Ltd. P'ship (In re Tobin), 258 B.R. 199, 205-06 (9th Cir. BAP 2001.) But the same is also true if, instead of personally misleading the auditor or banker, they knowingly allowed their agents to provide false information to the auditor or AFC because, under the

-15-

circumstances here, the fraud committed by their agents can be imputed to the Debtors for purposes of § 523(a)(2)(A).

In Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014), the Panel adopted the standard for imputation of fraud liability articulated by the Eighth Circuit in Walker v. Citizens State Bank (In re Walker), 726 F.2d 452 (8th Cir. 1984), and concluded that, to be true to the policies of the Bankruptcy Code and case law, the emphasis should be the actions of the debtor. Id. at 266. As the Panel explained, to show that an agent's fraud should be imputed to the debtor, the creditor seeking an exception to discharge must show that the debtor acted with "culpable state of mind," and that the debtor "knew or should have known" of the perpetrator's fraudulent activities. Id. at 267.

In this case, the bankruptcy court made the sort of findings necessary under In re Huh to show that Debtors knew, or should have known, that false representations were made to the auditors by their staff. In particular, the court found that Obara "knew the sales status of vehicles financed by Plaintiff. If a vehicle, financed by Plaintiff, was sold or remained on the lot, Obara knew about it. Obara knew that an incorrect accounting of the vehicles had been provided during the September 2008 audit. Obara failed to take appropriate action to correct the wrong." Memorandum at 20.

In addition, even if Obara and Castro did not personally, or through others, misinform the auditor or AFC about the true state of affairs concerning the cars securing the debts, if they withheld critical information from AFC with the intent to defraud

the creditor, an exception to discharge is appropriate. <u>Citibank (South Dakota), N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 1082, 1089-90 (9th Cir. 1996) (holding that "a debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive."); <u>see also</u> <u>Harmon v. Kobrin (In re Harmon)</u>, 250 F.3d 1240, 1246 (9th Cir. 2001); RESTATEMENT (SECOND) OF TORTS § 551 (1976).

In this case, it is undisputed that, in the JM Automotive Notes, Obara and Castro signed an Unconditional and Continuing Guaranty of the debt of JMAG which imposed the following obligations upon them to AFC:

> 4.0 Upon the sale of any item of purchase money inventory, Dealer shall hold the amount received from the disposition of inventory in trust for the benefit of Lender.
>
> * * *
>
> 5.1 Unless Purchase Money Inventory is the subject of a retail Installment Contract . . . or is sold pursuant to Section 4.0, Dealer shall not attempt to or actually sell, lease, transfer, mortgage, encumber, or otherwise dispose of the Purchase Money Inventory[.]
>
> * * *
>
> 5.3 Dealer shall keep and maintain the collateral in good repair and safe condition.
>
> 5.4 Dealer has kept and shall continue to keep true and accurate books and records concerning the business affairs and the collateral.

The bankruptcy court found that by these guaranties, and other warranties they made to AFC, Debtors had an affirmative obligation to provide a complete accounting, and to remit the sales proceeds of sold cars, to AFC, and generally to "keep safe" the vehicles. Memorandum at 20.

-17-

The bankruptcy court found that both Obara and Castro were present at the dealership during the auditor's visits in September 2008, and had spoken with the auditor. Both were aware that there were irregularities with the audit that they must address before it would be "closed." At least as to Obara, the court also found that "Obara knew that an incorrect accounting of the vehicles had been provided during the September 2008 lot audit . . . [and that] Obara failed to take appropriate action to correct the wrong."[11]

Though they had a contractual duty to fully disclose correct information to AFC about the vehicles and sales transactions, the bankruptcy court determined that, instead, the auditor, and later Sterling, were given false statements about the status of the cars to mask the truth that numerous "missing vehicles" that the auditor had been informed were sold unpaid, on test drive, or were demos had in fact been sold, and the liens of AFC not paid.

Finally, the bankruptcy court determined that Castro engaged in fraudulent representations to Sterling regarding the string of dishonored automated payments made by JMAG to AFC between September 23 and 25, 2008. Indeed, the court found that Castro "inexcusably withdrew" $142,100.37 from the JM Automotive accounts, during the time the ACH transfers to AFC (some of which were performed by Castro in Sterling's presence) for $78,764 were dishonored. While a single bad check is not a false representation for exception to discharge purposes, Williams v.

---

[11] The court had evidence from the testimony of Durazo, the auditor, that he had given a copy of his audit results to Obara. Trial Tr. 99:8–100:1, March 6, 2012.

-18-

*United States*, 458 U.S. 279, 284 (1982), the bankruptcy court found that "Castro was aware of the amount of funds available [or not] in the account." Memorandum at 21. The court therefore could reasonably infer that the numerous dishonored ACH transfers from JMAG to AFC were tantamount to fraudulent representations, by which Debtors were stalling for time so that they could liquidate the vehicle inventory before AFC could exercise its contractual rights to repossess and accelerate any debt.

At bottom, whether the debtor made a misrepresentation is a finding of fact reviewed for clear error. *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466 (9th Cir. 1996) (citing *Lansford v. LaTrattoria (In re Lansford)*, 822 F.2d 902, 904 (9th Cir. 1987)); *Miller v. IRS (In re Miller)*, 174 B.R. 791, 794 (9th Cir. BAP 1994). Here, based upon the disputed evidence, the bankruptcy court did not clearly err in determining that Obara and Castro made false representations to AFC in connection with the audit, or otherwise engaged in fraudulent conduct in their dealings with AFC.

**B. Knowledge of Falsity and Intent to Deceive the Creditor**

The bankruptcy court examined the evidence of the representations and behavior of Obara and Castro at the time of the September audit process and thereafter. The court determined that Debtors' knowledge of the falsity of the information given to AFC, and their intent to deceive the creditor "can be inferred from Defendants' failure to remit sale proceeds." Moreover, as the court noted, JMAG dishonored hundreds of thousands of dollars in ACH transfers to AFC during this time. And, of course, forty-nine of the cars that were on the lot on Friday, had

-19-

disappeared by the following Monday, and were subsequently found to have been sold for less than the debt owed AFC over the weekend, only for Sterling to be informed that the business was closed.

Simply put, the record includes ample evidence from which the bankruptcy court could reasonably infer that Obara and Castro acted with a fraudulent state of mind at the time of, and subsequent to, the September audit. Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 758 (9th Cir. 1981) (The existence of scienter is a question of fact, not to be reversed on appeal unless clearly erroneous.); Williamson v. Busconi, 87 F.3d 602, 603 (1st Cir. 1996) (explaining that "subsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made"); Stein v. Tripp (In re Tripp), 357 B.R. 544, 548 (Bankr. D. Ariz. 2006) (noting that a court "may consider subsequent conduct to the extent that it provides an insight into the debtor's state of mind at the time of the representations.").

## C. Justifiable Reliance

To sustain an exception to discharge, § 523(a)(2)(A) also requires that the bankruptcy court find that the creditor justifiably relied on a debtor's false statements or misrepresentations. Field v. Mans, 516 U.S. 59, 74-75 (1995). Justifiable reliance is measured under a subjective standard, which turns on a person's knowledge under the particular circumstances. In re Eashai, 87 F.3d at 1090. "Justification is a matter of the qualities and characteristics of the particular

plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. (quoting Field, 516 U.S. at 70). Therefore, the inquiry regarding the justifiable standard focuses on "whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made." Beneficial Cal., Inc. v. Brown (In re Brown), 217 B.R. 857, 863 (Bankr. S.D. Cal. 1998).

The justifiable reliance standard generally does not entail a duty to investigate; a person may be justified in relying on a representation even if he might have ascertained the falsity of the representation had he made an investigation. See Field, 516 U.S. at 70. However, a creditor's duty to investigate arises by virtue of suspicious circumstances. Id. at 71. Thus, "justifiable reliance does not exist where a creditor ignores red flags." In re Anastas, 94 F.3d at 1286; Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte), 180 B.R. 223, 229 (9th Cir. BAP 1995)(same).

The bankruptcy court addressed Debtors' arguments that, in this case, AFC ignored several significant "red flags" about Debtors' business operations. The court noted that the evidence showed that, before September 2008, AFC had received the required payments for financed vehicles within the ninety-day curtailment period required by the JM Automotive Notes. The court also had evidence that JMAG had passed forty of forty-one audits before September 2008. Based on this and other evidence, the court summarized, "the evidence fails to show that, prior to August 2008, Plaintiff disregarded red flags based on its knowledge of

-21-

JMAG's financial difficulties." Memorandum at 24. We see no error in the court's reasoning.

The bankruptcy court also heard the testimony of Sterling about his concerns with the inconsistency between the representations made to the auditor, his company's records, and his discussions with third party lenders identified by the auditor's report calling the true status of several vehicles into question. He testified that in light of the findings in the audit he immediately went to the dealership to inquire about the delay in closing the audit, and again later to inquire about the many dishonored ACH transfers. Sterling noted that, based on JMAG's long history of good payments, and what he perceived as the efforts of its management, including Castro, to close the audit, he did not, at least initially, feel compelled to exercise the power to terminate the parties' credit relationship, to accelerate the debt, or to repossess the cars. However, Sterling testified that, had he known of the false representations made to the auditor, he would have immediately exercised the repossession option: "Obara and Castro mislead the AutoVin auditors on September 18 and 19, 2008, as to the status of AFC's collateral. Had we known the true facts, AFC would have repossessed its Collateral on September 19, 2008." Sterling Dec. at 6-7, July 18, 2011.

Perhaps in retrospect AFC should have been more keenly alert to the possibility that the information Debtors were giving the creditor about the status of the vehicles, and their ACH payments, was unreliable. However, based on the conflicting evidence, the bankruptcy court did not clearly err in finding

that there were no red flags that would have caused AFC to investigate further, and would have prevented its reliance on the false representations made to the auditor to be justified.

### D. Proximate Cause and Damages

Another element for an exception to discharge under § 523(a)(2)(A) is that AFC must have sustained loss or damages as the proximate result of the misrepresentations having been made. In re Sabban, 600 F.3d at 1221. Proximate cause under § 523(a)(2)(A) requires a finding by the bankruptcy court that there was (1) causation in fact, or in other words, that the debtor's misrepresentations or fraud was a substantial factor in determining the course of conduct that results in loss and (2) legal causation, which requires the creditor's loss to reasonably be expected to result from the reliance. Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 70 (1st Cir. 2012) (citing Restatement (Second) of Torts, §§ 546, 548A) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."); Burks v. Bailey (In re Bailey), 499 B.R. 873, 891 (Bankr. D. Idaho 2013) (same).

Concerning AFC's loss as a result of Debtors' fraud, the bankruptcy court found that:

> Defendants made representations on behalf of JM Automotive with the knowledge and intent to deceive Plaintiff. Had Plaintiff known JM Automotive withheld funds from the sale of vehicles financed by Plaintiff, Plaintiff could have discontinued financing vehicles for JM Automotive and enforced its rights under the terms of the JM Automotive Notes. Instead, Plaintiff was kept in the dark and as a result suffered damages of $2,000,688.00 — the outstanding balance on the lines

-23-

> of credit extended to JM Automotive. The damages were proximately caused by Defendants' and JM Automotive fraudulent conduct. . . . In sum, the court finds Plaintiff has established all five elements required under § 523(a)(2)(A) by a preponderance of the evidence.

Memorandum at 25. We agree with the bankruptcy court that Debtors' misconduct caused AFC to suffer a loss. We disagree, however, with the court's determination of the extent of that loss.

In particular, we do not understand how the facts in this case support a fraud exception to discharge for the full balance due on the AFC debt. Of course, apparently to this day, AFC has not recovered any of the sums due on the 170 cars that were not properly accounted for in the September audit. And we understand that Sterling testified that, had he known of the falsity of the representations made to the auditor, he would have immediately repossessed the cars on the lot.

However, only forty-nine cars "went missing" during the September audit. It was only as to these vehicles that AFC could have exercised its repossession rights but for Debtors' fraud. Put another way, while AFC no doubt suffered a loss from the other missing, and presumably sold, vehicles, that loss cannot be tied to Debtors' misconduct during the September audit. Thus, AFC's damages stemming from Debtors' fraudulent representations in September 2008 must be limited to the balance due on the forty-nine cars, not the full balance due on the JM Automotive Notes.

In sum, we AFFIRM the judgment of the bankruptcy court determining that, as a result of Debtors' false representation

-24-

and fraud, AFC is entitled to an exception from discharge under § 523(a)(2)(A). However, we REVERSE that portion of the judgment incorporating the bankruptcy court's incorrect calculation of the amount of AFC's damages as equaling the full amount due from Debtors to AFC on the 170 cars, rather than the amount due for the missing forty-nine cars.[12] However, based upon our conclusions about AFC's § 523(a)(6) claim below, we do not think a remand to the bankruptcy court to calculate the correct amount of damages is necessary at this time.

## II.

**The bankruptcy court did not err in determining that the debt owed by Debtors to AFC was excepted from discharge under § 523(a)(6).**

Section 523(a)(6) provides: "(a) A discharge under 727 . . . of this title does not discharge an individual debtor from any debt — . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." Ordinarily, tortious conduct is a required element for a finding of exception to discharge under § 523(a)(6), and we look to state

---

[12] At argument before the Panel, counsel for AFC conceded that an exception to discharge under § 523(a)(2)(A) would only apply to the value of the forty-nine cars. However, counsel argued that the bankruptcy court's award of $2,000,688 was less than the Kelly Bluebook value of the cars of approximately $2.6 million. The Panel asked counsel if the $2.6 million referred to the forty-nine cars, and counsel replied yes. It appears that counsel was confusing the value of the 170 cars with the value of the forty-nine cars. According to AFC's own evidence, the Kelly Bluebook value of the forty-nine cars was $638,297.54, and the outstanding debt owed by JMAG to AFC on those forty-nine cars was $627,938.98; the Kelly Bluebook value of the 170 cars was approximately $2.6 million. Plaintiff's Trial Exh. 6 at 2-4.

law to determine the elements of a tort. Lockerby v. Sierra, 535 F.3d 1038, 1040 (9th Cir. 2010). Whether a particular debt is for willful and malicious injury by the debtor to another or the property of another under § 523(a)(6) requires application of a two-pronged test: the creditor must prove that the debtor's conduct in causing the creditor's injuries was both willful and malicious. Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702,711 (9th Cir. 2008) (citing Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002) and requiring the application of a separate analysis of each prong of "willful" and "malicious").

To show that a debtor's conduct is willful requires proof that the debtor deliberately or intentionally injured the creditor or the creditor's property, and that in doing so, the debtor intended the consequences of his act, not just the act itself. Kawaauhau v. Geiger, 523 U.S. 57, 60-61 (1998). The debtor must act with a subjective motive to inflict injury, or with a belief that injury is substantially certain to result from the conduct. In re Su, 290 F.3d at 1143; Petralia v. Jercich, 238 F.3d 1202, 1208 (9th Cir. 2001).

An injury is malicious within the meaning of § 523(a)(6) if the debtor (a) commits a wrongful act, (b) done intentionally, (c) which necessarily causes injury and (d) the act is done without just cause or excuse. In re Su, 290 F.3d at 1147.

Here, the bankruptcy court determined that, in their dealings with AFC, Debtors committed an intentional conversion of

-26-

AFC's collateral under California law.[13]  "[T]he elements of conversion are the creditor's ownership or right to possession of the property at the time of conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages."  Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420, 427 (9th Cir. BAP 2002) (citing Farmer's Ins. Exch. v. Zerin, 51 Cal. App. 4th 445, 451 (1997)); Meserali v. Fulwider, 53 Cal. App. 4th 445, 447 (1988) (holding that, in California, a debtor may be liable for conversion where the debtor wrongfully withholds personal property from a creditor entitled to the property under a security agreement).

In particular, the bankruptcy court found that Debtors had:

> sold and transferred a total of one hundred and seventy vehicles financed by Plaintiff.  Plaintiff held a security interest in those vehicles at the time of the sale and transfer.  By selling and transferring the one hundred and seventy vehicles without repaying Plaintiff and obtaining the original titles or MSOs to pass on to buyers, JM Automotive wrongfully deprives Plaintiff of its security interest.  As a result of JM Automotive's actions, Plaintiff was damaged in the amount of $2,000,688.00 — the outstanding balance on the lines of credit extended to JM Automotive for the one hundred seventy vehicles.

---

[13]  A judgment for conversion under California law "does not, without more, establish that a debt arising out of that judgment is nondischargeable under § 523(a)(6)."  Peklar v. Iklar (In re Peklar), 260 F.3d 1035, 1038 (9th Cir. 2001).  Instead, such a judgment decides only that the defendant has engaged in the "wrongful exercise of dominion" over the personal property of the plaintiff; it does not necessarily decide that the defendant has caused a "willful and malicious injury" within the meaning of § 523(a)(6).  Id.  Of course, there was no state court judgment entered against Debtors.  However, the bankruptcy court examined both the willful and malicious prongs of the § 523(a)(6) test, and decided that all requirements for an exception to discharge were satisfied.

Memorandum at 27.

The bankruptcy court correctly found that the conversion of the 170 vehicles was willful and malicious. As to the willfulness prong, the court found on the evidence that, among other actions, Debtors sold or transferred forty-nine vehicles the weekend of September 26, 2008, knowing that it would deprive AFC of its security interest in the vehicles, and by these actions, they exhibited a subjective motive to inflict injury on AFC. We agree with the bankruptcy court that, given these facts, the court could reasonably infer that Debtors acted willfully, "because the evidence indicates that JM Automotive knew its conduct [] was substantially certain to cause injury to Plaintiff and JM Automotive had the subjective motive to inflict injury to Plaintiff on or about the weekend of September 26, 2008." Memorandum at 27.

As to the malicious prong, the bankruptcy court found, based on the evidence, that Debtors intentionally deprived AFC of its security interest without just cause or excuse. Memorandum at 27. Again, we agree with the bankruptcy court that this is a reasonable inference under these facts.

The one significant objection by Debtors to the bankruptcy court's ruling that there was an exception to discharge under § 523(a)(6) is based on the Ninth Circuit's opinion in Transam. Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 554-55 (9th Cir. 1991). Debtors argue that, because AFC did not show that Debtors used the diverted car sale proceeds for their own purposes and, instead, used the money to pay other debts, AFC has not shown Debtors acted maliciously.

-28-

Of course, Littleton was decided before Geiger, Jercich and Su revised the Circuit's case law concerning the proof required for an exception to discharge under § 523(a)(6). In addition, Littleton held that, for a flooring agreement like the one at issue in this appeal, malice could not necessarily be shown solely by the fact that the debtor diverted the proceeds from the sale of the collateral of a secured creditor to pay other creditors. Id. However, the Littleton court observed that the debtor in that case was operating with hopes of saving the business. As noted by the bankruptcy court in this case, the Littleton court had concluded that:

> the methods by which [the debtor] made payments and handled inventory did not constitute acts that necessarily produced harm. Furthermore, the bankruptcy court found that at all times the debtors were acting with the hope and expectation of saving the business and that they cooperated with Transamerica by seeking additional financing that would allow Jacob's to stay in business. Additionally, the debtors offered a third trust deed on their residence as additional security for the loan. Moreover, there was no evidence that the debtors used any of the proceeds for their personal benefit, or that any other creditor was paid other than in the ordinary course of business in the month before insolvency proceedings were filed.
>
> Considering these facts, it was not clearly erroneous for the bankruptcy court or the BAP to conclude that the debtors' acts would not have necessarily produced harm. Consequently, the debtors' conduct was not malicious, as that term is used in § 523(a)(6).

Id. at 555.

In this case, in contrast to Littleton, the bankruptcy court found that Debtors were not motivated by a desire to preserve their business. Rather, "Defendants' behavior suggests a desire to extract as much money as possible from a failing business." Memorandum at 28. This finding adequately supports the

-29-

bankruptcy court's conclusion that Debtors' conversion of 170 vehicles, and the sale proceeds, was a malicious enterprise, justifying an exception to discharge under § 523(a)(6).

**CONCLUSION**

We AFFIRM the bankruptcy court's judgment concluding that a portion of the debt owed by Debtors to AFC is excepted from discharge under § 523(a)(2)(A), but we REVERSE its determination under § 523(a)(2)(A) of the amount of damages suffered by AFC as a result of Debtors' fraudulent conduct. We AFFIRM the bankruptcy court's judgment that the debt of $2,000,688.00 owed by Debtors to AFC is excepted from discharge under § 523(a)(6). Under the circumstances, we decline to remand the damages issue under § 523(a)(2)(A) to the bankruptcy court since no purpose would be served at this time by doing so.