FILED

FEB 26 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

In re:                        )    BAP No. NC-14-1154-JuTaPa
                              )
DEBRA A. HART,                )    Bk. No. 11-42424
                              )
            Debtor.           )    Adv. No. 11-04177
_____)
DEBRA A. HART,                )
                              )
            Appellant,        )
v.                            )    M E M O R A N D U M[*]
                              )
BEVERLY KARAEFF,              )
                              )
            Appellee.         )
_____)

Argued and Submitted on February 19, 2015
at San Francisco, California

Filed - February 26, 2015

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable William J. Lafferty, Bankruptcy Judge, Presiding
_____

Appearances:    David Ashley Smyth argued for appellant Debra A.
                Hart; Steven J. Hassing argued for appellee
                Beverly Karaeff.
                _____

Before:  JURY, TAYLOR, and PAPPAS Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

-1-

Chapter 7[1] debtor Debra A. Hart appeals from the bankruptcy court's judgment in favor of appellee-creditor, Beverly Karaeff, finding the amount of $450,000 (plus prejudgment interest of $222,904.11 for a total of $672,904.11) nondischargeable under § 523(a)(2)(A).

We AFFIRM the bankruptcy court's decision finding that the debts associated with the August 15, 2007 transaction ($200,000), the August 27, 2007 transaction ($100,000), and the May 20, 2008 transaction ($100,000) are nondischargeable in the total amount of $400,000. The bankruptcy court found the $50,000 debt associated with the December 10, 2007 transaction was discharged: "Debtor was not sufficiently involved in the . . . $50,000 in a manner that would support non-dischargeability as to her." Because the $50,000 amount was included in the judgment ($450,000), we REMAND this matter to the bankruptcy court for the limited purpose of entering a corrected judgment in the amount of $400,000 plus prejudgment interest.

## I.   FACTS

The bankruptcy court wrote an extensive Memorandum Decision following an eight-day trial on the underlying adversary proceeding in this case. We borrow heavily from the bankruptcy court's recitation of the facts but do so in a summary fashion for purposes of this appeal.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

## A.    Prepetition Events

Debra is a licensed real estate agent and her husband, Clyde Hart (referred to as Toby throughout these proceedings) is a real estate broker and real estate developer.  Their son Lance held a contractor's license.  Debra, Toby and Lance owned various real estate-related businesses.

### 1.    New Horizon Investments, Inc.

In September 2002, Debra formed New Horizon Investments, Inc. (NHII), now a suspended California corporation, as a vehicle through which to receive her real estate sales commissions to minimize her tax liability.  In June 2004, Debra and Toby jointly owned a sixty percent equity interest in NHII and Lance owned the remaining forty percent equity.  Debra was the President and Toby was the Secretary of the company, at least initially.  Lance served as Chief Financial Officer and Vice-President of NHII during the period of formation of GTP Properties Ltd. (GTP).

### 2.    GTP Properties Ltd.

GTP was a limited partnership formed in 2004, with NHII as the sole general partner.  The Harts used GTP from time to time in efforts to develop the Shady Glen property (further described below).  To that end, with the assistance of counsel, they drafted a Private Placement Memorandum (PPM), Subscription Agreement (SA) and Limited Partnership Agreement (LPA) for GTP.

The PPM was intended as an aid to those considering investing in GTP.  The PPM identifies GTP as a limited partnership created for the sole purpose of acquiring and developing Shady Glen and states that the general partner of

GTP, NHII, is under contract to purchase the property from a third party. The goal of the "Shady Glen Real Estate Project" was to build, and ultimately sell to "third party buyers," two homes on two lots. The PPM also states that, through the efforts of NHII, the property has been approved for a lot split and that design plans for two 5000 square foot houses are being considered. The PPM goes on to state that NHII is under contract to purchase Shady Glen, that as part of the project NHII will sell its entire interest in the property to GTP for $2,000,000 (the "Purchase Price") and that upon payment of the Purchase Price, GTP would hold title to Shady Glen "free and clear."

The PPM states that NHII shall raise the capital necessary to develop the Shady Glen property by sale of 120 partnership units at $30,000 each. Thus, the entire capitalization of the partnership was to be raised by equity investments from partners. The PPM expressly states:

> [In] the event that there remains an undersubscription of the Partnership Units, the General Partner would reject all investor subscriptions, promptly notify the subscribed investors of such rejection, and promptly return to the subscribed investors, in full, any subscription monies paid by them.

The PPM describes NHII as a California corporation whose shareholders are Toby and Debra Hart, as husband and wife, as to a sixty percent interest, and Lance, as to a forty percent interest. Toby, Debra and Lance were identified as the directors of the corporation; Toby was President of the corporation, Debra was Secretary-Treasurer and Lance was

-4-

Vice-President.

The SA changed the financial arrangements described in the PPM slightly, by decreasing the purchase price for each Partnership unit to $25,000 (for a total of 144 Units), but retained the overall capital to be raised, solely via equity investments, at $3,600,000. The language quoted above from the PPM concerning the effect of an undersubscription of the Partnership was repeated verbatim in the second paragraph of the SA.

Consistent with the provisions of the PPM and the SA, the LPA states that the sole purpose of the Partnership is to acquire and develop Shady Glen and that the funds necessary for the project, the sum of $3,600,000, will be raised via the sale of equity investments to limited partners. The LPA identifies NHII as the General Partner and gives the General Partner fairly standard powers of control and management of Partnership operations and assets.

The Harts first used GTP to raise capital in June 2004. Four partners, including Gary and Janette Drew, invested a total of $800,000. The Harts gave the Drews the PPM, SA and LPA which pertained to two homes on two lots. The Drews eventually invested a total of $200,000 in the project.

**3.   Shady Glen**

Shady Glen was a 2.21 acre parcel of undeveloped land on a hillside in Walnut Creek, California. NHII acquired Shady Glen from Eugene Wolsky via a "Vacant Land Purchase Agreement," dated September 2, 2003, that called for the property to be transferred to NHII for a total price of $1,200,000, with a

closing to occur on January 9, 2004.  Although Wolsky gave NHII a grant deed dated January 23, 2004, in fact the escrow for the transaction did not close, and the deed was not recorded, until July 2, 2004, when NHII provided Wolsky the proceeds of a loan in the amount of $800,000 from Sequoia Mortgage Capital ("Sequoia").  Thereafter, NHII effected a lot split into what would be known as "Lot A" and "Lot B," each slightly larger than one acre.

In 2006, Toby and Debra, through their roles in NHII, transferred both lots to Debra, personally, as her sole and separate property.  Lot B was deeded to Debra on August 1, 2006.  Lot A was deeded to Debra on September 7, 2006.  Each deed was recorded shortly after its execution.

### 4.    The Transactions Between Karaeff And The Harts

Debra met Karaeff at an open house that Debra hosted in 2004.  Debra listed and sold Karaeff's Oakland home in 2004 and was Karaeff's agent when she purchased a home in the Harts' Diablo neighborhood that year.  Toby and Lance remodeled that home for a total cost of approximately $300,000.  During this time, Karaeff became a close friend of Debra, Toby and the Hart family generally.

When Karaeff entered the scene as a lender and/or an investor in the Shady Glen project, Debra owned the entire property.  The house on Lot A was under construction, financed through a construction loan from Washington Mutual Bank ("WAMU") in the total amount of $1,837,500 which was secured by a deed of trust on Lot A.  Lot B was undeveloped at that time and was security for obligations to Sequoia.  Sequoia held deeds of

trust on Lot B securing a $400,000 loan obtained on August 1, 2006, and a $200,000 loan obtained on October 19, 2006.

In 2007, Karaeff obtained an equity line of credit on her home and began investing, or loaning, various sums of money with the Harts. Four transactions are relevant in this appeal.

On August 15, 2007, Karaeff advanced $200,000 (it is disputed whether it was a loan or an investment). In connection with this transaction Debra gave her the PPM, SA and LPA, but this time the documents pertained to the development of one home on Lot B. The bankruptcy court refers to these documents signed by Karaeff as relating to "GTP II." Referring to this version of documents, the bankruptcy court found Debra had primarily prepared the PPM.

Karaeff loaned another $100,000 on August 27, 2007, and $50,000 on December 10, 2007.

On May 20, 2008, she made a short-term loan of $100,000 through Toby, ostensibly to one of his associates, Mr. Mendleson.

The Harts did not pay Karaeff back any portion of the $200,000 she advanced nor did she receive payment on her other loans. Eventually, Karaeff learned that Lot A and Lot B had been lost to foreclosure.

**B.    Bankruptcy Events**

On March 4, 2011, Debra filed her chapter 7 petition.

On June 4, 2011, the Drews filed an adversary proceeding against Debra, Toby and others seeking to have their debt in the amount of $200,000 found nondischargeable under § 523(a)(2)(A) and (a)(4).

Two days later, Karaeff filed an adversary proceeding against Debra, Toby, Lance, Two Harts, Inc.,[2] Two Harts Construction & Development Incorporated and NHII, seeking to have $450,000 found nondischargeable under § 523(a)(2)(A) and (a)(4).

Lance, Toby and Two Harts, Inc. filed motions to dismiss in both adversary proceedings on the grounds that the bankruptcy court did not have jurisdiction to enter a judgment against them and a judgment could not be rendered nondischargeable against them because they were not debtors in the related bankruptcy case. The bankruptcy court granted both motions and dismissed the adversary proceedings as to these non-debtor defendants. Karaeff later sued Toby for fraud in state court.

Subsequently, the bankruptcy court entered an order granting Karaeff's Civil Rule 42[3] motion to consolidate her adversary proceeding with the Drews' adversary proceeding for all purposes. Debra did not appeal that order. Karaeff's and the Drews' adversary proceedings were jointly tried on April 1-4, May 6-7, and August 5, 6, 8 and 9, 2013. Following

---

[2] Lance owned Two Harts, Inc.

[3] Civil Rule 42(a), made applicable to bankruptcy proceedings by Rule 7042, provides:

    (a) Consolidation. If actions before the court involve a common question of law or fact, the court may:

    (1) join for hearing or trial any or all matters at issue in the actions;
    (2) consolidate the actions; or
    (3) issue any other orders to avoid unnecessary cost or delay.

the trial, the bankruptcy court issued separate memoranda of decision for the respective cases of Karaeff and the Drews.

The bankruptcy court found in favor of Debra and against the Drews based upon the statute of limitations.

In this case, the bankruptcy court noted that Karaeff's financial involvement with the Harts and their entities was contested. During the trial, Debra denied any involvement in the various transactions. The bankruptcy court stated that it was "struck by the Harts' consistent failure to offer rational, sensible, candid explanations regarding the transactions giving rise to these disputes." The court further stated that "the 'story' to which the Harts testified, as regarding most disputed facts, ranged from implausible, to logically inconsistent, to entirely self-serving." Therefore, the bankruptcy court based its conclusions of law in large part on the facts it found and determined through the credible testimony of Karaeff.

The court determined that Debra made false misrepresentations in connection with the $200,000 loan/investment and that the other elements of § 523(a)(2)(A) were met. With respect to the August 27, 2007, and May 20, 2008, loans, both in the amount of $100,000, the bankruptcy court found that Debra's involvement in the transactions rose to a level sufficient to find nondischargeability. The bankruptcy court entered the nondischargeability judgment in favor of Karaeff on March 14, 2014. Debra timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C.

-9-

§ 158.

## III. ISSUES

A. Whether the bankruptcy court erred by finding the $200,000 debt nondischargeable; and

B. Whether the bankruptcy court applied an incorrect legal standard regarding Debra's state of mind for a finding of fraud in connection with the August 27, 2007 $100,000 transaction and May 20, 2008 $100,000 transaction.[4]

## IV. STANDARDS OF REVIEW

The question of whether a particular debt is dischargeable is a mixed question of fact and law that we review de novo. See Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382 (9th Cir. BAP 2011); see also Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004) (stating that mixed questions are reviewed de novo when they require the court "to consider legal concepts and exercise judgment about values animating legal principles.").

To the extent an issue within the mixed question can be identified as solely a question of fact, it is subject to a clearly erroneous standard of review. See Rose v. United

---

[4] Debra listed five issues in her opening brief which we distilled into the two claims of error as set forth above. Karaeff contends that Debra waived some of her listed issues because they were not included in Debra's Statement of Issues (SOI) on Appeal (which originally stated twenty-two issues). We disagree there is any waiver on this basis. See Office of the U.S. Tr. v. Hayes (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.), 104 F.3d 1147, 1148 (9th Cir. 1997) (arguments not specifically listed in an SOI are not waived) and Wages v. J.P. Morgan Chase Bank, N.A., (In re Wages), 508 B.R. 161, 164 (9th Cir. BAP 2014).

*States*, 905 F.2d 1257, 1259 (9th Cir. 1990). Moreover, the clearly erroneous standard does not permit us to conduct a de novo review of the evidence, but it does allow this Panel to consider whether there was enough evidence in the record to support the factual findings of the bankruptcy court. See Civil Rule 52(a) (made applicable to bankruptcy proceedings by Rule 7052(a)).

A finding of whether a requisite element of a § 523(a)(2)(A) claim is present is a factual determination that we review for clear error. See *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir. 1996); *Candland v. Ins. Co. Of N. Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1987) (whether there has been a misrepresentation is a finding of fact reviewed for clear error); *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997) (intent to deceive under § 523(a)(2)(A) is a question of fact). A bankruptcy court's factual findings are clearly erroneous if they are illogical, implausible, or without support from inferences that may be drawn from the record. *United States v. Hinkson*, 585 F.3d 1247, 1259–61 (9th Cir. 2009) (en banc).

## V.  DISCUSSION

### A.  Legal Standards:  § 523(a)(2)(A)

Under § 523(a)(2)(A), a debtor is not discharged in bankruptcy from any debt obtained by "false pretenses, a false representation, or actual fraud." The creditor bears the burden, under the preponderance of the evidence standard, of demonstrating each of the following five elements:
(1) misrepresentation, fraudulent omission or deceptive conduct

-11-

by the debtor; (2) knowledge of the falsity or deceptiveness of the representation or omission; (3) an intent to deceive; (4) the creditor's justifiable reliance on the representation or conduct; and (5) damage to the creditor proximately caused by reliance on the debtor's representations or conduct. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Citibank v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996).

"The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (citation omitted).

Because direct evidence of intent to deceive (the scienter element) is rarely available, "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 167–68 (9th Cir. BAP 1999); Household Credit Servs., Inc. v. Ettell (In re Ettell), 188 F.3d 1141, 1145 n.4 (9th Cir. 1999) ("reckless conduct could be sufficient to establish fraudulent intent"); Houtman v. Mann (In re Houtman), 568 F.2d 651, 656 (9th Cir. 1978) ("Reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct is sufficient to establish the knowledge

element."). Accordingly, a bankruptcy court may find the requisite intent "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 174–75 (9th Cir. BAP 2007) (discussing intent to deceive in the context of § 727(a)).

Finally, we are mindful that "exceptions to discharge should be strictly construed against an objecting creditor and in favor of the debtor." Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992); Mele v. Mele (In re Mele), 771 F.3d 1119, 1125 (9th Cir. 2014).

**B.   The bankruptcy court did not err in finding that the $200,000 debt was nondischargeable.**

After a multi-day trial, the bankruptcy court determined that all the elements for finding the $200,000 nondischargeable were met based on the following:

Misrepresentations:  Debra was aware of Karaeff's significant home equity.  Debra told Karaeff that Karaeff "needed to get her money working for her" which evidences Debra's involvement in soliciting money from Karaeff and also goes to her role in inducing Karaeff's reliance.

The court found that Debra made the following statements to Karaeff with regard to the $200,000 transferred August 15, 2007, for the development of Lot B through what Debra and Toby represented to be a limited partnership: (1) Debra told Karaeff that $200,000 was needed immediately to begin construction on Lot B; (2) Debra gave Karaeff the SA, which included the statement that, in the event of under-subscription, all

-13-

subscription monies would be returned to the limited partners; (3) Debra gave Karaeff the LPA, the stated primary purpose of which was the development of Lot B; and, (4) Debra told Karaeff that the property was free and clear of liens. All of these statements were false.

Knowledge That The Statements Were False: Debra admitted that she had no intention to develop Lot B at the time she convinced Karaeff to invest as a limited partner for Lot B's development. She stated that she wanted to live in the home on Lot A, without the inconvenience of a neighboring residence on Lot B. None of the $200,000 was used for the development of Lot B. The Harts had no plans to build a house on Lot B, but nonetheless represented to Karaeff that such a home would be sold with profits distributed to partners within a year. Even with a substantial underscription, Debra never attempted to return Karaeff's investment. Finally, the property was not free and clear at the time that Karaeff committed her $200,000.

Intent to Deceive: Debra intended to deceive Karaeff and induce her reliance on those statements. Debra supplied partnership documents for GTP II, a sham "partnership" which was never formed and was never intended to be formed. Debra also convinced Karaeff to commit $200,000 after Karaeff expressed that she was initially inclined to invest $100,000.

Justifiable Reliance: The court determined that Karaeff's reliance on Debra's statements was justifiable. Debra and Karaeff were close friends. Karaeff had no prior experience in real estate development through a partnership. Karaeff trusted the expertise of her friend, Debra, who convinced her that the

-14-

investment was a good idea through any number of statements both oral and contained within the partnership documents Debra had supplied to Karaeff.

Damages: Karaeff was damaged in the initial amount of $200,000 as a result of her reliance on Debra's false statements.

On appeal, Debra challenges the bankruptcy court's findings on several grounds. First, Debra argues that the court erred in finding that (1) she told Karaeff that $200,000 was needed immediately to begin construction on Lot B and (2) she gave Karaeff the LPA, the stated primary purpose of which was the development of Lot B. Debra maintains that the bankruptcy court erroneously based these findings on the premise that she knew that Lot B could never be developed because she had decided irrevocably that she wanted someday to live in the house on Lot A and never have a neighbor on Lot B. According to Debra, "this was not [her] testimony on the issue." She also stated that Toby wanted to build on Lot B and ". . . well if that is what he wishes that is where - what we're going to do."

Whether there has been a misrepresentation is a finding of fact reviewed for clear error. In re Candland, 90 F.3d at 1469. The record shows that at another point during the trial Debra testified: "I had no intention of having another home built on Lot B ever." Further, Toby testified that from the time Karaeff paid the $200,000 until the date Lot B was lost to foreclosure there was no construction done on Lot B. He also testified that he had no idea where the money was actually used.

The bankruptcy court did not find the Harts' testimony

-15-

credible. Based on the court's credibility determination, a rational factfinder could find that Debra's contradicting statements regarding the development of Lot B were not worthy of belief and could reasonably infer that neither Debra nor the Harts ever intended to construct a home on Lot B. Where there are two permissible views of the evidence, the factfinder's choice between them is not clearly erroneous; this applies to credibility-based findings and to findings based on inferences from other facts. Lewis v. Ayers, 681 F.3d 992, 999 (9th Cir. 2012); Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985). In short, we discern no clear error.

Next, Debra argues the bankruptcy court erred in finding that she made a false statement when she gave Karaeff the SA, which included the statement that, in the event of undersubscription, all subscription monies would be returned to the limited partners. Debra submits that there is no evidence in the record to show that at the time Karaeff transferred the $200,000, she intended that it would not be returned should the remaining investment money not be raised.

Again, there is no merit to this argument. Whether there is an intent to deceive is a question of fact subject to the clearly erroneous standard. In re Kennedy, 108 F.3d at 1018. Likewise, we review the sufficiency of the evidence to support a factual finding under the clearly erroneous standard. See Civil Rule 52(a). Because Debra asserts there is **no** evidence regarding her intent to deceive, our review under the clearly erroneous standard requires a complete set of the trial

-16-

transcripts and other relevant evidence considered by the bankruptcy court.  See Friedman v. Shelia Plotsky Brokers, Inc. (In re Friedman), 126 B.R. 63, 68 (9th Cir. BAP 1991) (citing Fed. R. App. P. 10(b)(2) which provides that "[i]f the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion.").  Debra failed to include a complete set of the trial transcripts in the record and has included the direct testimony by declaration of only Karaeff and herself.  Therefore, we are unable to address Debra's "no evidence" argument.  See Ehrenberg v. Cal. State Univ., Fullerton Found. (In re Beachport Entm't), 396 F.3d 1083, 1087 (9th Cir. 2005) (failure to provide essential transcripts or portions thereof can result in an adverse decision on the merits).

Moreover, whether Debra had the intent to deceive is a question of fact that can be inferred from the totality of the circumstances, so Debra's credibility is an important factor. Here, the bankruptcy court properly considered the totality of the circumstances and did not find the Harts' testimony credible.  The court found Debra's intent to deceive was "readily" apparent:

> Debtor supplied Karaeff with partnership documents for GTP II, a sham 'partnership' which was never formed, and was never intended to be formed.  Debtor made other false statements regarding the development of Lot B, which she admitted was never going to happen on her watch and she also convinced Karaeff to commit $200,000 after Karaeff expressed that she was initially inclined to invest $100,000.

These findings, which turned on credibility determinations, are not clearly erroneous.

Debra also challenges the bankruptcy court's finding that her statement to Karaeff that the property was free and clear of liens amounts to a false misrepresentation. According to Debra, the bankruptcy court's finding was based upon Karaeff's statement in her direct written testimony referring to a statement allegedly made orally by Debra when they first visited the Shady Glen site:

> Debi told me that she had found the property one day and wrote a check for it on the spot without even telling her husband. She said the property was free and clear.

Debra argues that this statement by the bankruptcy court is not quoted but paraphrased, and it does not specify whether Karaeff's claim was that the property was free and clear when purchased or free and clear at the time that the statement was made. Debra also maintains that the investment documents and the alleged description of the investment say nothing about the property being free and clear of liens until it is purchased by the limited partners, at which time the owner (and presumably his mortgages) would be paid off. Debra opines that it is irrelevant to the buyer whether the seller owns the property free and clear of liens since whatever liens are on the property will be paid off in escrow. In the end, Debra asserts there is not enough information as to what was said or heard or understood by either Debra or Karaeff regarding the casual "no lien" statement during that first visit to Shady Glen to constitute evidence of dishonesty on Debra's part.

These arguments are not only unclear but also unconvincing. Even assuming there was error, it was harmless when the bankruptcy court identified numerous other misrepresentations made by Debra to Karaeff. Any one of these statements would be sufficient to support the nondischargeability of the $200,000 debt without the "no lien" statement. Moreover, in considering the totality of the circumstances to determine whether Debra had the intent to deceive, the bankruptcy court could properly consider whether Debra's "no lien" statement to Karaeff during the first visit to the Shady Glen property was part of a pattern of falsity. In sum, Debra has offered no basis for us to overturn the bankruptcy court's conclusion that the $200,000 debt was nondischargeable based on Debra's fraud.

Debra also makes a number of arguments in her reply brief about the bankruptcy court's findings on the $200,000 debt. We do not consider them because arguments raised for the first time in a reply brief are waived. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1289 n.4 (9th Cir. 2000).

**C. The bankruptcy court did not err in finding that the August 27, 2007 debt in the amount of $100,000 was nondischargeable.**

With respect to this debt, the bankruptcy court noted that Karaeff conceded that Debra was not present when Karaeff and Toby entered into the August 27, 2007 loan for $100,000.

The bankruptcy court's Memorandum Decision reflects that after eight days of trial, Debra brought an oral motion under Civil Rule 52 for judgment on partial findings with respect to the August 27, 2007 $100,000 loan. After discussion concerning the motion, the court determined that Karaeff was not alleging

-19-

any direct involvement by Debra and must prove this aspect of her case, if at all, by resort to imputation of Toby's fraudulent statements on a partnership theory. After trial, in its written findings of fact and conclusions of law, the bankruptcy court sua sponte reconsidered that aspect of its decision. Upon reconsideration, the court found that Debra was "directly involved" in the August 27, 2007 $100,000 transaction such that the debt was nondischargeable in her bankruptcy.

In her original SOI, Debra listed as an issue: Whether the bankruptcy court committed an error of law or an abuse of discretion that during the trial, the judge stated that out of the four loans involved in the trial, the middle two loans involving $150,000 were out. No defense was given on those two loans. In his decision he stated he revisited "those loans" and included them in the judgment. In her opening brief, Debra does not raise, challenge, or otherwise analyze whether the bankruptcy court's decision to sua sponte reconsider its earlier ruling had any impact on her. Therefore, any arguments relating to this issue are waived. Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief.").

The bankruptcy court found that Debra was directly involved in the August 27 transaction in the following ways:

> (1) Approximately one month earlier, in July 2007, Debra told Karaeff on two occasions that she needed to get her money working for her; the Court has already found that Debra was aware of Karaeff's equity in her home and instrumental in helping Karaeff obtain the

-20-

line of credit that would finance the $100,000 advanced on August 27, 2007; (2) Debra made false and misleading statements to Karaeff regarding Lot A—the development project that would purportedly benefit from the $100,000 loan. Debra took Karaeff to Shady Glen, showed her the house on Lot A and said that it would be completed within 30 to 45 days. Whether this statement was false when made or an overly optimistic projection could be argued. But Debra also said that the property was free and clear of liens, which was clearly a false statement; (3) Karaeff's relationship with Debra was such that statements by Debra carried significant weight on a personal level, given their friendship, and on a professional level, given Debra's presentation as an individual with knowledge and expertise in real estate development. **The Court believes that Toby, on his own, could not have obtained this $100,000. Debra's conduct, through these false and misleading statements, was essential to Karaeff's decision to advance funds** (emphasis added).

The bankruptcy court further found:

Toby then came to Karaeff on the date in question and said that he needed $100,000 to finish the house on Lot A. This statement was false when made. The money that Karaeff loaned was never used to develop Lot A. In his trial testimony, Toby said he could not recall whether any amount of that sum was used in the construction on Lot A. But during his deposition, Toby admitted that none of the proceeds of that loan was used for Shady Glen. Toby intended to deceive Karaeff by inducing her reliance on the false statement. He did so, and Karaeff justifiably relied on Toby's statement. Damages resulted when the money, loaned for the completion of Lot A, was not used in any part for that purpose and was not returned to Karaeff.

The bankruptcy court noted that the Ninth Circuit ruled, under similar facts, that an individual in Debra's position may be held directly responsible for her role in a fraudulent scheme. La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d 902, 904-05 (9th Cir. 1987). In In re Lansford, the Ninth Circuit concluded that, by virtue of her participation and involvement in a fraudulent transaction, a wife could be held culpable for that transaction, even where her husband actually

-21-

prepared the fraudulent statement. The debtor husband made a false financial statement in connection with a purchase of a restaurant from plaintiff. After debtor husband and debtor wife jointly filed bankruptcy, plaintiff brought an action under § 523(a)(2)(B) against both husband and wife.

Instead of relying on imputation on a partnership theory through agency principles, the Ninth Circuit cited evidence which connected debtor wife to the financial statement and the deception. Evidence establishing the debtor wife's direct role in the fraud included findings that: (1) debtor wife was involved in initiating discussions with La Trattoria, even if through her husband; (2) debtor wife discovered the potential restaurant venture; and, (3) debtor wife signed the purchase documents transferring the restaurant which repeated a misrepresentation contained within the false financial statement. Id. at 904. The Ninth Circuit found debtor wife "culpably responsible" for the fraud. Id. It reversed the ruling of this Panel that had declined to impose liability on debtor wife due to lack of "knowledge or connivance" on her part. Id. at 903.

After considering the facts and holding in In re Lansford, the bankruptcy court concluded:

> Although Debra was not physically present when Karaeff loaned $100,000 at a meeting with Toby, this event occurred approximately one month after Debra and Karaeff visited Shady Glen, and approximately two weeks after Debra made other false statements about Shady Glen in connection with the 'partnership development of Lot B. In the middle weeks of August, Debra was instrumental in the process by which Karaeff obtained the line of credit through which Karaeff would fund advances to Hart entity projects. The Court finds Debra's role in the fraud to be direct and

-22-

essential to its success. Her false statements regarding Lot A in July and early August of 2007 are properly carried forward to the August 27, 2007 transaction date. . . . Based on the foregoing, all elements of [§] 523(a)(2)(A) are established . . . .

On appeal, Debra argues that there is **no** evidence that Karaeff's August 27, 2007 loan was made with her knowledge or participation. Again, we cannot address Debra's "no evidence" argument without the complete trial transcript and other evidence considered by the bankruptcy court.

Next, citing Bullock v. BankChampaign, N.A., 133 S.Ct. 1754 (2013) and Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014) (en banc), Debra maintains there must be some evidence that she knew Toby was asking Karaeff for additional loans and that he was intending to defraud her and that she, Debra, had participated directly in these fraudulent loans. Debra fails to provides any analysis as to how the holdings in Bullock and In re Huh help her case. Her challenge seems to be that the bankruptcy court applied an incorrect legal standard regarding her state of mind for a finding of fraud when she was neither present when the loan was made to Toby nor did she have knowledge of the loan.

The Supreme Court in Bullock held that the term "defalcation" is treated similarly to "fraud" for purposes of § 523(a)(4). 133 S.Ct. at 1756. The court ruled that defalcation "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Id. at

-23-

1757. Where actual knowledge is lacking, intent can still be shown for purposes of § 523(a)(4) if the "fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." Id. at 1759-60.

The Panel in In re Huh considered the mental state for fraud set forth in Bullock in connection with the imputation of fraud under § 523(a)(2)(A) when a partnership or agent-principal relationship was found. The Panel, sitting en banc, held that before an agent's fraud may be imputed to the debtor-principal, for purposes of the discharge exception for debts obtained by actual fraud, proof is required that the debtor is culpable, that is, that the debtor "knew or should have known" of the agent's fraud, though the debtor need not have participated actively in the fraud. 506 B.R. at 272.

Neither Bullock nor In re Huh help Debra on appeal. There is no indication that the holding in Bullock heightens the state of mind required for fraud under § 523(a)(2)(A) as already required in this Circuit. Further, the bankruptcy court found it unnecessary to find a "de facto partnership"[5] through which to impute Toby's fraud to Debra under agency and partnership principles because the court found "direct, culpable, conduct by Debra and involvement by her in the fraud such that it is her own." Therefore, the standards for the imputation of fraud set forth in In re Huh are not applicable.

---

[5] Karaeff had alleged in her first amended complaint that Debra, Lance and Toby were "defacto partners" with each being the agent of each of the others.

-24-

In addition, Debra never argues that the bankruptcy court's reliance on In re Lansford was improper or otherwise misplaced. Even in the absence of "knowledge or connivance," the holding in In re Lansford allows the imposition of liability when there is evidence showing Debra's direct role in the fraud. Here, the bankruptcy court considered Debra's conduct and misleading statements made to Karaeff one month prior to this transaction, Debra's close personal relationship with Karaeff, and Debra's role in helping Karaeff obtain the substantial line of credit on her property. The bankruptcy court found that Debra's conduct and misleading statements were essential to Karaeff's decision to advance the funds. Accordingly, the bankruptcy court found sufficient circumstantial evidence from which to infer Debra's direct role in the fraud.

Debra does not challenge any of these findings on appeal nor does she contend that these facts do not support an inference of her direct involvement in the fraud. In any event, insofar as the bankruptcy court's findings were based mostly on its credibility determinations, such determinations are entitled to special deference. Leon v. IDX Systems Corp., 464 F.3d at 958. In sum, Debra has offered no basis for us to overturn the bankruptcy court's conclusion that the $100,000 debt was nondischargeable based on Debra's direct involvement in the fraud.

**D.    The bankruptcy court did not err in finding that the May 20, 2008 debt in the amount of $100,000 was nondischargeable.**

In connection with this loan, Karaeff's account is that she was having dinner and watching television with Toby and Debra on

-25-

May 20, 2008. Toby was on the phone, stopped his conversation, and asked Karaeff if she would like to make a quick $6,000 through loaning his associate $100,000 that would be paid back in thirty days at six percent interest. It was later revealed to Karaeff, by Toby, that this associate was Mendelson. Karaeff stated that Debra was present, the two looked at each other, and Debra smiled saying "it will be okay." The bankruptcy court found Karaeff's testimony credible on the Mendelson transaction, in contrast to the Harts' testimony which was evasive and relied on facts not proven at trial. The court further found that:

> Debra and Toby jointly participated in this fraud, each making statements to solicit the Mendelson $100,000 from Karaeff. Toby made the false statement that he would loan, on Karaeff's behalf, $100,000 to his friend. Debra's statement "it will be okay" appears, at a minimum, to be sufficiently reckless to be a false statement under 523(a)(2)(A). Even without finding that this statement on its own supports a claim for non-dischargeability, Debra's role in inducing Karaeff's reliance on a false statement made by Toby is sufficient direct involvement in the fraud such that fraudulent intent by Debra is found and she, under <u>Lansford</u>, is responsible for any non-dischargeable debt.

The court next assessed Debra's statement, "it will be okay," to determine whether it was so recklessly indifferent to the truth as to be fraudulent. The bankruptcy court found:

> Debra was, at best, recklessly indifferent to the truth of her comforting assertion that Karaeff's money was safe with Mendelson, via Toby. Furthermore, the context of the transaction suggests that Debra knew Toby's motives and that the money was not going to Mendelson.
>
> Debra added her statement to bolster Toby's false statement and to induce Karaeff's reliance. The Court need not find this statement false in itself. It is the most significant evidence of Debra's involvement in the fraud, which was as follows: (1) Karaeff was Debra's friend, who was socializing with Debra and

Toby on the night the transaction occurred; their relationship was such that Karaeff would rely on Debra's advice and opinion; (2) Were the money to go to Shady Glen (and it appears that it was never transferred to Mendelson out of the Two Harts account), Debra would directly benefit from the Karaeff loan as it would go toward the construction of her home in an otherwise economically challenged project; (3) Debra, knowing that the money was not going to Mendelson, offered her assurance through smiling and saying "it will be okay." This statement was intended to induce Karaeff's reliance on Toby's false statement. Finding Debra directly involved with the fraud, this Court concludes that this debt may be determined non-dischargeable in Debra's bankruptcy.

On appeal, Debra again complains there is no evidence in the record to support the bankruptcy court's decision. She further claims, without citation to any authority, that the bankruptcy court's finding of reckless indifference to the truth without a finding of dishonesty is not enough.

We summarily dispose of Debra's argument in relation to this transaction. To the extent Debra is relying on Bullock and In re Huh, those cases do not help her case as explained above. Here, applying the principles set forth in In re Lansford, the bankruptcy court found that Debra directly participated in the fraud. In so finding, the court properly considered Debra's reckless disregard for the truth when she stated "it will be okay." Under § 523(a)(2)(A), "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." In re Gertsch, 237 B.R. at 167–68. And, again, witness credibility played an important role in the trial court's determination. In sum, Debra has offered no basis for us to overturn the bankruptcy court's conclusion that the $100,000 debt was nondischargeable based on Debra's direct involvement in the fraud.

-27-

**E.    Remaining Issues**

Debra contends that the bankruptcy court's findings and evidence in the Drews' adversary proceeding cannot be considered in this appeal.  Debra further asserts that Karaeff cannot allege for the first time on appeal that the findings or the evidence in Drew are relevant to Debra's mens rea in Karaeff. Finally, she maintains that the Drews were strangers and Karaeff was a personal friend so statements in the Drew case should not be considered here.

Debra fails to point out what evidence is in the record before us regarding the Drews' case that has any bearing on the issues raised in this appeal.  The bankruptcy court granted Karaeff's Civil Rule 42 motion to consolidate her adversary proceeding with that of the Drews for all purposes, including trial.  We found nothing in the record to show that she appealed this order.  Instead she now complains about the effect of the consolidation for the first time in this appeal which we do not consider.  See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[W]e will not consider arguments that are raised for the first time on appeal.").

**VI.    CONCLUSION**

For the reasons stated, we AFFIRM the bankruptcy court's decision regarding the nondischargeability of the August 15, 2007 $200,000 debt, the August 27, 2007 $100,000 debt, and the May 20, 2008 $100,000 debt for a total of $400,000.  Because the bankruptcy court found the December 2007 debt dischargeable, but also included this amount in the judgment for $450,000 (plus prejudgment interest), we REMAND this matter to the bankruptcy

court for the limited purpose of correcting the judgment.